Filed 7/31/14  In re Jaylen M.

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re JAYLEN M., a Person Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | D065508 |
| Plaintiff and Respondent, | (Super. Ct. No. J518846) |
| v. | |
| D.A., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Kimberlee A. Lagotta, Judge.  Affirmed.

Valerie N. Lankford, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Lisa M. Maldonado, Deputy County Counsel, for Plaintiff and Respondent.

D.A., a dependent of the juvenile court, challenges the sufficiency of the evidence to support the court's disposition order removing her infant son, Jaylen M., from her custody.  (Welf.

& Inst. Code, § 361, subd. (c)(1).)[1]  She contends there was a reasonable alternative to removal, specifically, temporarily placing her and Jaylen together at Polinsky Children's Center (Polinsky) while the San Diego County Health and Human Services Agency (the Agency) attempted to locate a foster home that would take both of them.  We affirm the order.

### FACTUAL AND PROCEDURAL BACKGROUND

D.A. is 17 years of age and a dependent of the juvenile court.  She was removed from her mother's custody at birth because she tested positive for drugs.  She has spent her childhood in a variety of placements.

Jaylen was born in September 2013, and he initially lived with D.A. at the Salvation Army Door of Hope (Door of Hope).[2]  In December 2013, Door of Hope notified the Agency of numerous concerns about D.A.  She was smoking marijuana, including when breast-feeding Jaylen; she lacked parenting skills and was unwilling to accept staff recommendations or assistance; she was threatening to go AWOL (absent without leave) and take Jaylen to Mexico unless a new placement option was identified; and she was increasingly verbally abusive to staff. The only placement option was Polinsky, which she refused.

Door of Hope staff reported that D.A. admitted she smoked marijuana.  Further, she "presents with a flat affect and does not mirror the baby when holding him"; she said she "does not want to parent Jaylen and does not want anyone else to have him because they want his 'Indian Money' "; she teased Jaylen "by putting [her] fingers in his mouth and waking him up when he [was] sleeping"; she left Jaylen "crying and shaking in his crib while she lay in her bed,

---

[1]     Further undesignated statutory references are to the Welfare and Institutions Code.

[2]     When the dependency proceedings began, the presumed father was also 17 years of age and a dependent of the juvenile court.  He is not involved in this appeal.

covered by a blanket, crying and holding her teddy bear," and when staff tried to "attend to Jaylen, [she] told staff not to pick him up"; she screamed at staff while holding Jaylen; she asked another resident to breast-feed Jaylen in exchange for $5.00; she called Jaylen an "asshole" and yelled at him to "shut up"; she "routinely hands her son off to others from shift to shift because she is in a constant state of frustration," and she "refuses prompts to feed him more when he is hungry or put clothes on him when he is cold."

On December 2, 2013, D.A. left a voice mail message for the social worker threatening to leave Door of Hope by 1:00 p.m. if she was not moved to another facility. On December 3, the social worker attended a team meeting at Door of Hope. D.A. threatened to go to Mexico, and the social worker encouraged her to stay there. D.A. cried and said, "I'm gunna get my shit and get out." She was advised that leaving without permission would result in Jaylen being taken into protective custody. D.A. yelled, "I don't want to be here." The social worker reminded her she was holding Jaylen, and she responded, "I don't fucking care." The social worker advised D.A. that the Agency would schedule a team meeting to discuss placement options. She left the meeting before it was completed.

The same day, Door of Hope gave D.A. a 30-day notice of discharge from the facility. The notice states: "While we do not expect teen moms to automatically know how to parent or even bond with their babies, it is highly concerning that [D.A.] does not respond to our interventions and often refuses to allow staff to intervene to meet her child's needs when she is unwilling to meet her infant son's needs herself. She is routinely placing her baby at risk of being hurt or neglected and this agency [is] at risk of liability. . . . [¶] As a result of ongoing assessment by the clinical team, we have determined that [D.A.'s] emotional instability seriously impairs her current ability to supervise, protect, or care for her child. It is our recommendation that [D.A] be

3

placed in a residential treatment program that can offer her a higher level of care to meet her emotional needs and to address the ongoing issue of substance abuse prior to her focusing on parenting."

In a telephone conversation after the team meeting, D.A. told the social worker she would not go to Polinsky. She admitted that she smoked marijuana once while breast-feeding Jaylen. The social worker asked about her behavior during the team meeting, and she responded, "If I'm going to scream in front of my child[,] I will. That is my child[,] I will raise him." The social worker offered her a voluntary service plan, and she responded, "Fuck no." The social worker explained that refusing a plan may result in court involvement.

On December 6, 2013, the Agency filed a petition on Jaylen's behalf under section 300, subdivision (b). The Agency's detention report states preplacement prevention services were ineffective to eliminate the need to remove Jaylen from the home because D.A. "is currently refusing to participate in services at Door of Hope." D.A. requested that she and Jaylen be placed with the maternal great-grandmother, but that was not a viable option because the great-grandmother had an extensive history with child protective services, including 35 referrals between 1980 and 2002. Her own children were raised primarily by extended family members because of her neglect and abuse.

At the detention hearing on December 9, 2013, D.A. requested that the Agency locate a foster home that would accept her and Jaylen. At the time, D.A. was detained at Polinsky.[3] The

---

3       After the hearing on December 9, 2013, D.A. and her brother, who was also at Polinsky, had a physical altercation in the cafeteria. The brother made a comment about her baby being taken away, and she slapped his face and yelled at him. He then slapped her face.

court made a prima facie finding of the need for detention and gave the Agency discretion to place mother and child "in [the] same foster home if one is located."

At the jurisdiction hearing on January 23, 2014, D.A. waived her right to trial and submitted to the petition as amended. The Agency's joint jurisdiction and disposition report states Jaylen was at substantial risk of harm because D.A. "is failing to meet [his] basic needs and has been putting [him] at risk with her substance abuse and lack of putting his needs above her own. . . . It is necessary for [her] to engage and make progress in services to address the issues that brought [her] to the attention of this Court."

An addendum report advised that during a team meeting on January 17, 2014, D.A. complained that her group home staff was not giving her enough attention and she wanted to change placements. The social worker told D.A. there were "currently two possibilities in Ramona for [her] to be placed with or near Jaylen." D.A., however, declined because she had extracurricular activities in San Diego and Ramona was too far away. If she moved, the foster parent "would need to be able to get her to all these activities." The social worker discussed a bus pass, but D.A. declined because she said she would "get lost." The team decided she would remain at the group home, which would provide transportation to her activities.

D.A.'s therapist participated in the meeting. She advised the Agency she had not seen D.A. "regularly for some time." D.A. had been diagnosed with attention deficit hyperactivity disorder and posttraumatic stress disorder and the therapist believed a medication evaluation would be appropriate. D.A., however, said she would not take medication because it would "make me fat and I'm not about to get fat." The social worker cautioned D.A. that not taking prescribed medication could adversely affect reunification, and she refused to talk about the matter further.

5

The court made a true finding on the petition by clear and convincing evidence. D.A. again requested that the Agency locate a foster home for her and Jaylen, and the court again gave the Agency discretion for such a placement.

At the contested disposition hearing on February 13, 2014, the matter was submitted on the Agency's reports discussed above, and a February 13 addendum report. The addendum report explained that on January 24, the social worker requested that the Agency's placement unit explore "all homes in San Diego that are willing to have a minor and the minor mother in their home." The placement options in Ramona were no longer available. D.A.'s group home confirmed that Jaylen could not be placed there and, as of February 11, there were no foster homes available for joint placement.

Further, the report states D.A. "does not demonstrate that she is currently able to put her child's needs ahead of her own," and she "continues to display behaviors that may warrant a group home level of care as . . . opposed to a foster home level of care." On January 29, D.A. admitted to the social worker "that she had been out drinking over the weekend" with Jaylen's father. On February 11, she walked out on a team meeting when her case plan was discussed.

The parties stipulated that if called, D.A. would testify "she's willing to live anywhere in the county with her son." She argued that as a reasonable alternative to removal, she and the baby "could be placed at Polinsky together, while they're waiting for a placement."

6

The court found by clear and convincing evidence that removal of Jaylen from the home was appropriate. It ordered that Jaylen remain in separate foster care and that the Agency provide reunification services.[4]

## DISCUSSION

### I

"After the juvenile court finds a child to be within its jurisdiction, the court must conduct a dispositional hearing. [Citation.] At the dispositional hearing, the court must decide where the child will live while under the court's supervision." (*In re N.M.* (2011) 197 Cal.App.4th 159, 169 (*N.M.*).) "A removal order is proper if based on proof of parental inability to provide proper care for the child and proof of a potential detriment to the child if he or she remains with the parent. [Citation.] 'The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child.' [Citation.] The court may consider a parent's past conduct as well as present circumstances." (*Id.* at pp. 169-170.)

"Before the court issues a removal order, it must find the child's welfare requires removal because of a substantial danger, or risk of danger, to the child's physical health if he or she is returned home, and there are no reasonable alternatives to protect the child. [Citations.] There must be clear and convincing evidence that removal is the only way to protect the child." (*N.M.,* *supra,* 197 Cal.App.4th at p. 170; § 361, subd. (c)(1).)

---

4    D.A. asserts that Jaylen's "trial counsel was in support of a joint placement." His counsel actually stated, "I would be supporting the Agency's recommendation. I don't believe it would be in Jaylen's best interest at this point in time to be placed with Mother or Father." Counsel added, "I would support the option, should it become available, to have Mother placed concurrently with the minor in an appropriate placement option."

"Whether the conditions in the home present a risk of harm to the child is a factual issue" subject to a substantial evidence standard of review. (*N.M., supra,* 197 Cal.App.4th at p. 170.) " '[O]n appeal from a judgment required to be based upon clear and convincing evidence, "the clear and convincing evidence test disappears . . . [and] the usual rule of conflicting evidence is applied, giving full effect to the respondent's evidence, however slight, and disregarding the appellant's evidence, however strong." [Citation.]' [Citations.] 'We have no power to judge the effect or value of the evidence, to weigh the evidence [or] to consider the credibility of witnesses . . . .' " (*In re Mark L.* (2001) 94 Cal.App.4th 573, 580-581, fn. omitted.)

II

A

D.A. challenges the sufficiency of the evidence to support the court's finding there was no reasonable alternative to removal. She asserts reversal is required because the court did not consider placing her and Jaylen together at Polinsky pending the Agency's effort to locate a joint foster home. We are unpersuaded.

The Agency tried to find a joint foster home, and located two potential homes in Ramona. D.A. rejected those homes as being too far away. She admits that it was not until the disposition hearing that she agreed to accept any joint foster home available in San Diego County. By that time, however, there were no homes available. She also did not suggest until the disposition hearing that joint placement at Polinsky on a temporary basis may be an option. She did not adduce any evidence such a placement was available, and before the hearing she was adamantly opposed to being detained at Polinsky. Under these circumstances, the court reasonably determined there was no joint placement available.

8

Further, the Agency determined that because of D.A.'s troubling conduct, she was not suitable for foster care and instead continued to need a group home. She admitted smoking marijuana while breast-feeding Jaylen, threatening to leave the country with him because she disliked her placement, drinking shortly before the disposition hearing, and walking out of a team meeting when her case plan was being discussed. The Agency's reports show she neglected Jaylen's needs. She depended on group home staff to care for him, she ignored cues that he needed to be fed and clothed, and she left him in his crib crying while she comforted herself with her own stuffed toys. Even if a temporary placement at Polinsky was available, on this record we cannot fault the court for determining there were no reasonable alternatives to removal. We conclude substantial evidence supports the court's order.

B

D.A. contends reversal is required because the Agency did not satisfy its obligation to aid the court in determining whether there were any reasonable means by which Jaylen could be protected without removal. (§ 361, subd. (c)(1).) D.A. cites California Rules of Court, rule 5.690(a)(1)(B)(i), which requires the social services agency to include in its report a "discussion of the reasonable efforts made to prevent or eliminate removal . . . ." D.A. also cites the recent opinion *In re Ashly F.* (2014) 225 Cal.App.4th 803 (*Ashly F.*), in which the appellate court reversed the disposition order for lack of substantial evidence because the record included no discussion of reasonable efforts. (*Id.* at p. 809.)

In *Ashly F.,* the mother physically abused her children and, after the detention hearing, she moved out of the family home where the husband remained. (*Ashly F., supra,* 225 Cal.App.4th at pp. 806-807.) The disposition report by the Department of Children and Family Services (DCFS) perfunctorily stated there were no " 'reasonable means' " by which the children could be protected

9

without removal and that " 'reasonable efforts' " were made to avoid removal. (*Id.* at p. 808.) The report did not elaborate other than to say the family was provided with reunification services. (*Ibid.*) The report "did not state that DCFS had conducted the prerelease investigation report on Father as it was directed to do at the detention hearing." (*Ibid.*) The court made no inquiry, and in its order parroted DCFS's assertion it made reasonable efforts to avoid removal. (*Ibid.*)

The appellate court concluded "DCFS and the court committed prejudicial errors in failing to follow the procedures mandated by the Legislature and the Judicial Council for determining whether the children needed to be removed from their home."[5] (*Ashly F., supra,* 225 Cal.App.4th at p. 810.) *Ashly F.* explains: "By the time of the hearing Father had already completed a parenting class. Furthermore, 'reasonable means' of protecting the children that should at least have been considered include unannounced visits by DCFS, public health nursing services, in-home counseling services and removing Mother from the home." (*Ibid.*)

This case is distinguishable from *Ashly F.* on several grounds. D.A.'s gripe is that the court did not consider joint foster care, and the Agency's reports explained its efforts to satisfy her request. Additionally, the Agency advised that in an effort to avoid removal it provided D.A. with a variety of services, including counseling, parent education and support, crisis intervention, visitation, and emergency shelter care. The Agency explained that despite these services, D.A.'s conduct remained dangerous to Jaylen. Further, the mother in *Ashly F.* was not a teenager in need

---

5    The rule of harmless error applies to appellate review of juvenile court rulings. (*In re A.M.* (2014) 224 Cal.App.4th 593, 598; *In re J.S.* (2011) 196 Cal.App.4th 1069, 1078.) "Before any judgment can be reversed for ordinary error, it must appear that the error complained of 'has resulted in a miscarriage of justice.' (Cal. Const., art. VI, § 13.) Reversal is justified 'only when the court, "after an examination of the entire cause, including the evidence," is of the "opinion" that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' " (*In re J.S.,* at pp. 1078, 1079.)

of group home care, the children there were not helpless infants, there was a father in the home as a potential caretaker, and removal of the children may have been avoided by removing the mother from the home.

We conclude the Agency's showing was satisfactory, and thus the court had no burden to inquire further. The parties submitted on the Agency's reports. Even if there was arguably any deficiency, it was harmless error.

DISPOSITION

The order is affirmed.

MCCONNELL, P. J.

WE CONCUR:

HUFFMAN, J.

MCINTYRE, J.

11