Filed 10/8/14  In re Z.Z. CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re Z.Z., a Person Coming Under the Juvenile Court Law. | B254945 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. DK00132) |
| Plaintiff and Respondent, | |
| v. | |
| JOSE Z., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Tony L. Richardson, Judge.  Affirmed.

Janette Freeman Cochran, under appointment by the Court of Appeal, for Defendant and Appellant.

Richard D. Weiss, Acting County Counsel, Dawyn R. Harrison, Assistant County Counsel, Melinda A. Green, Deputy County Counsel, for Plaintiff and Respondent.

_____

Father Jose Z. appeals from a disposition order of the juvenile court.  Following the assertion of juvenile court jurisdiction over Z.Z., based largely on risk of harm from father's conduct, the court ordered that mother (Maria G.) retain physical custody of Z.Z. under the supervision of the Los Angeles County Department of Children and Family Services (DCFS).  Z.Z. was not to live with father.  The court ordered that father have monitored visits.  On appeal, father contends there was insufficient evidence to support the removal of Z.Z. from his custody under Welfare and Institutions Code section 361, subdivision (c)(1).[1]  Father further contends the juvenile court abused its discretion in ordering only monitored visits.  We find no error and affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

In May 2013, mother was living in an apartment with 10-month-old Z.Z. and her two sons from another relationship, 13-year-old Angel G. and 16-year-old Raul G. Father lived in a different apartment in the same complex.  In mid-May, DCFS first began investigating the instant case after receiving a referral indicating father had physically abused three of his older children, Karen Z., Ev.Z., and Al.Z.[2]  Mother told DCFS she never left Z.Z. alone with father and she did not trust him. She said father severely physically abused Karen and Ev.Z. and she was worried father might "do something to [Z.Z.] because father is very short tempered."

Mother also recounted an incident that had happened a few days earlier. While mother was in the bathroom at her apartment washing her face, father insisted on taking Z.Z. away.  Raul objected because he knew mother did not allow father to take Z.Z.  Father and Raul began arguing; father eventually started to choke Raul. Mother heard the commotion and came out, then asked father to calm down and leave.

---

[1]     All further statutory references are to the Welfare and Institutions Code.

[2]     Father has five children unrelated to mother: twins Karen and Ev. Z. (16 years old at the time of the petition), Al.Z. (13 years old), Ar.Z. (11 years old), and Ed.Z. (9 years old).  Although it appears all five children lived with father at some point, the detention report noted Karen and Ev.Z. were then living with their mother, and the three younger children were in Mexico with their paternal uncle.

Raul corroborated mother's account. He told a DCFS social worker that since the incident, he was avoiding mother's house until he knew father would not be there. Mother and Raul reported the incident to the police. According to a police report, Raul said father had encircled his neck with his arm, leaving Raul unable to breathe. Father then threw Raul to the floor.

Mother told a DCFS social worker that father angered easily. He had threatened to hurt his daughters' boyfriends. He and mother argued because father disagreed with mother's "parenting skills," and because mother did not allow father to take Z.Z. anywhere alone. Mother said father spanked Z.Z. when he was only seven or eight months old. Z.Z. was throwing a tantrum and threw his head backwards. In response, father spanked Z.Z. over his diaper "pretty hard." Raul recounted similar facts. Mother thought this was a severe response to the tantrum, but she said nothing to avoid an argument. Although Z.Z. cried after the spanking, mother said he was not injured.

Mother told DCFS she intended to go to family law court to "obtain custody" of Z.Z. and limit father to monitored visits, but she was unsure how to start the process. She had never seen father abuse his other children, but "a lot of the people" in the apartment complex "knew" father was "very abusive towards the children in his home." Mother denied any domestic violence between her and father. She admitted they had exchanged "offensive words."

Father admitted having an altercation with Raul over father's desire to take Z.Z., but he denied choking Raul. Instead, father said that when Raul stopped him from taking Z.Z., father moved to push him out of the way, but Raul got on top of Z.Z. Father claimed he gently grabbed Raul by the neck and moved him out of the way. Father denied any violence. He admitted he may have threatened Raul, at some point, because he sometimes loses control. He told the social worker he had an open case with DCFS because on one occasion he hit his children with a belt. He was attending weekly therapy sessions and understood he needed help. He explained that when he is extremely upset he "goes into two worlds. . . [in the] first world he transports himself to a nice place and in the other world he goes to a bad place where he plans his revenge on people."

Father's daughter Ev.Z. told a social worker that her twin sister, Karen, left father's house because she was afraid of him. Ev.Z. said father had touched her inappropriately on one occasion. She was afraid of father because he threatened people. Ev.Z. said father was "crazy" and she was afraid father would follow through on the many threats he had made. She asserted father used to beat her mother and "there was blood all over the place." She did not want to continue living with father, describing him as "beyond strict." She denied current corporal punishment but said father beat her and her siblings in the past.

In June, mother told a social worker she heard father was telling people he was going to kill Raul once he was an adult, and that he planned to hurt his ex-wife. Mother had not yet gone to court to obtain a restraining order or initiate custody proceedings. Mother said father was very violent and she was scared. The next day, mother completed paperwork for a restraining order. However, father went out of state and was not served. Mother did not attend the scheduled hearing on the restraining order.

In July, mother and father requested a meeting with a DCFS social worker. During the meeting, father admitted physically abusing Ev.Z., but denied any sexual abuse. He informed the social worker that Ev.Z. and Karen now lived with their mother in Washington, and his other children were living in Mexico with his brother. Father admitted having an anger management problem and advised he was in counseling. He wanted to know why the investigation regarding Z.Z. remained open. Mother said she had not secured a restraining order because she understood that Ev.Z. retracted her claim that father sexually abused her, and father's other children now said he was not violent.

Mother told the social worker father and Raul jointly spoke to father's therapist and "they came to the conclusion" that father did not choke Raul. However, even after this conversation, father told the same social worker he choked Raul because he did not want father to take Z.Z.; father also said he wanted to hurt Raul but held back because Raul is a minor. Father further admitted "that he beat his other children up." Father said he knew he used excessive discipline with Karen, but it was related to her having a

4

positive pregnancy test. When asked why he sent his children to Mexico while a DCFS case was pending, father said he believed the case was voluntary and "the children are his children and he would do what he wanted with them." Father admitted physically disciplining Z.Z. when he was seven or eight months old and was throwing a tantrum and tossing his head back. Father said he would do it again if necessary. He had told mother that children need physical discipline "to learn that they are the parents and must follow direction."[3]

The juvenile court detained Z.Z. and released him to mother. DCFS filed a dependency petition regarding Z.Z., Angel, and Raul, alleging jurisdiction was appropriate under section 300, subdivisions (a), (b), (d), and (j) due to father's physical abuse of Raul, Z.Z., and father's daughters; mother's failure to protect Raul and Z.Z.; and father's sexual abuse of Ev.Z.

In a subsequent jurisdiction and disposition report, Raul said he was not sure father choked him. Mother described father as "a very calm person" and cooperative with monitored visits. Father denied choking Raul. He now claimed he only touched Raul's shoulder. Regarding the spanking incident, mother said she told father not to spank Z.Z., and that father did not spank Z.Z. hard because it was over a diaper. Father admitted he spanked Z.Z. but said it was not excessive and Z.Z. cried only after father used a stern voice. Father admitted he hit Karen and Ev.Z. excessively, he used a belt, and that he had made a mistake in doing so.

In December, father told a social worker he had stopped attending counseling because talking about the DCFS case was causing him to have stomach pains. He reported that his monitored visits with Z.Z. were going well, but he was concerned about Z.Z.'s behavior, such as his habit of throwing himself back so that he hit his head. Father said spanking worked, but now he was prohibited from doing it; he told the social worker he knew the solution for Z.Z.'s behavior was spanking. Father said he spanked

---

[3]  Father denied domestic violence with his ex-wife but admitted he made a plan to kill the ex-wife and her lover when he found out she was cheating on him; however he did not go through with the plan.

his daughters when they were Z.Z.'s age and it worked to stop bad behavior. When the social worker raised the issue that father's physical punishment had gone too far, father answered: " 'To this day, I do not regret it, not even leaving marks on their legs.' "[4]

At the February 2014 jurisdiction hearing, father pleaded no contest to counts in an amended petition alleging he choked Raul, as well as counts alleging father struck his other children (Karen, Ev.Z., Al.Z., Ar.Z., Ed. Z.) with a belt, this was inappropriate physical discipline, and it placed Raul, Angel, and Z.Z. at risk of harm. Father challenged the counts regarding his physical abuse of Z.Z. by spanking. The court sustained the amended petition in full and found Z.Z., Raul, and Angel to be persons described by section 300.[5] At the disposition hearing, father's therapist testified that father was in treatment for post-traumatic stress disorder and anger management. During visits the therapist monitored, he saw father treat Z.Z. gently and lovingly. Father testified he had spanked Z.Z. only to stop him from injuring himself. Although father testified he told the DCFS social worker that in the moment he spanked Z.Z. he "believed that it was the correct way to discipline, . . . and that [he] would do so again if [he] had to protect [Z.Z.] from his own actions," he said his current view was that he would not use the same kind of discipline again. He admitted he continued to need help to deal with his anger.

The juvenile court declared Z.Z., Raul, and Angel dependents of the court. The court ordered that mother would "retain physical custody" of the children, and "continue[d] to find that continuance in the home of the father would be contrary to the children's welfare." The court placed the children under DCFS supervision, and ordered the department to provide services to both parents. The court ordered monitored visits

---

[4]     Father added: " 'I [would] rather have done that, than finding my daughters' bodies wrapped in plastic bags because they were sneaking out in the middle of the night to meet up with guys and because those guys had girlfriends who were in gangs and who decided to kill my daughters.' "

[5]     The sustained petition included allegations that mother failed to protect Z.Z.

for father with Z.Z. three times per week in a public setting. The court gave DCFS discretion to liberalize the visits.

Father timely appealed.

## DISCUSSION

### I. Substantial Evidence Supported the Disposition Orders

On appeal, father contends there was insufficient evidence to support the juvenile court's section 361, subdivision (c)(1) order removing Z.Z. from his custody, and the court abused its discretion when it ordered only monitored visits. We disagree.

#### A. Removal From Father's Custody

Under section 361, subdivision (c)(1), "[a] dependent child may not be taken from the physical custody of his or her parents or guardian or guardians with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence . . . [t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's or guardian's physical custody."

" 'A removal order is proper if based on proof of a parental inability to provide proper care for the child and proof of a potential detriment to the child if he or she remains with the parent. [Citation.] "The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child." [Citation.] The court may consider a parent's past conduct as well as present circumstances.' [Citation.]" (*In re A.S.* (2011) 202 Cal.App.4th 237, 247 (*A.S.*).)

"On appeal from a dispositional order removing a child from a parent we apply the substantial evidence standard of review, keeping in mind that the trial court was required to make its order based on the higher standard of clear and convincing evidence. [Citation.]" (*In re Ashly F.* (2014) 225 Cal.App.4th 803, 809.)

7

As an initial matter, DCFS argues the court did not act under section 361, subdivision (c) as Z.Z. did not live with father at the time the petition was initiated, and the court did not remove Z.Z. from mother's custody. The plain language of section 361, subdivision (c) states it applies to the removal of a dependent child "from the physical custody of his or her parents or guardian or guardians with whom the child resides at the time the petition was initiated." We thus agree that the court's order is more appropriately characterized as one under section 362, subdivision (c), which provides: "If a child is adjudged a dependent child of the court, on the ground that the child is a person described by Section 300, and the court orders that a parent or guardian shall retain custody of the child subject to the supervision of the social worker, the parents or guardians shall be required to participate in child welfare services or services provided by an appropriate agency designated by the court." Once the court issues an order under section 362, subdivision (c), the remaining hearings are pursuant to section 364 and are held at six-month intervals.[6] (*In re Pedro Z.* (2010) 190 Cal.App.4th 12, 19-20.) In this case, the court in fact ordered that the next hearing after the disposition hearing was to be a section 364 six-month review.

Further, under section 362, subdivision (c), the court is "vested with discretion to make 'any and all reasonable orders to the parents or guardians of the child who is the subject of any proceedings under this chapter as the court deems necessary and proper to carry out the provisions of this section . . . . The program in which a parent or guardian is required to participate shall be designed to eliminate those conditions that led to the court's finding that the child is a person described by Section 300.' (§ 362, subd. (c).)"

---

[6] Section 364, subdivision (a) states: "Every hearing in which an order is made placing a child under the supervision of the juvenile court pursuant to Section 300 and in which the child is not removed from the physical custody of his or her parent or guardian shall be continued to a specific future date not to exceed six months after the date of the original dispositional hearing. The continued hearing shall be placed on the appearance calendar. The court shall advise all persons present of the date of the future hearings, of their rights to be present, and to be represented by counsel."

(*In re A.L.* (2010) 188 Cal.App.4th 138, 145.) This suggests the juvenile court's order limiting father's ability to have Z.Z. in his home is subject only to review for an abuse of discretion. (*Id.* at pp. 140, 144-145 [mother and father lived separately and child lived with mother but father sometimes provided care; court declared child dependent but allowed mother to retain custody; because "parental custody . . . was not disrupted by the dispositional order" father was not entitled to reunification services.].)

However, even assuming a section 361, subdivision (c) removal analysis is appropriate to review the juvenile court's order that "continuance in the home of the father would be contrary to [Z.Z.'s] welfare," we would find no error.[7] Substantial evidence supported the dispositional order in this case. Father not only used physical discipline with Z.Z. when he was only seven or eight months old, father repeatedly indicated he thought physical discipline was the best method and he had only stopped because of DCFS involvement. This attitude alone may not have established potential detriment to Z.Z.'s safety if father continued to have unfettered access to him. However, there was significant and undisputed evidence that father had used *excessive* physical discipline with his older children. Only a few months before the disposition hearing, father told a social worker he did not regret physically disciplining his teenage daughters—even though this discipline included the use of a belt—and he did not even regret hitting them such that it caused marks. There was also substantial evidence that father had become so enraged at Raul that he choked him, in an altercation regarding Z.Z., and in which Z.Z. was present and in harm's way. Father admitted he continued to have problems with anger. Father's own statements revealed that he spanked his older

---

**7**      The juvenile court did not state the statutory basis for its order. The accompanying minute order included the following findings: "By clear and convincing evidence pursuant to WIC 361(b): Substantial danger exists to the physical health of minor(s) and/or minor(s) is suffering severe emotional damage, and there is no reasonable means to protect without removal from parent's or guardian's physical custody. . . . Reasonable efforts have been made to prevent or eliminate the need for removal of the minor from the home of parent(s)/legal guardian(s)." Section 361, subdivision (b) concerns voluntary relinquishment and is not applicable in this case.

children when they were Z.Z.'s age, that this physical discipline did not cease when the children were older, and eventually the physical discipline got out of hand.

Father's equivocal statements about the use of physical discipline with Z.Z. and his older children, the evidence that his physical discipline of his older children had eventually turned into something equal to or approaching abuse, his uncontrolled, violent conduct with Raul, and his continuing problems managing anger all provided substantial evidence that there would be substantial danger in allowing father unfettered access to Z.Z.

Father contends the juvenile court erred because it neither mentioned any alternatives to removal from father's custody nor stated the facts on which it based its decision to remove Z.Z. as required under section 361, subdivision (d).[8] Father further asserts that with appropriate services, Z.Z. could have been returned to the custody of both parents. We reject these contentions.

In the jurisdiction and disposition report, DCFS identified its efforts to prevent removal of Z.Z. from father. These included "family reunification services" to father, monthly contact with "the family," and referrals to father. The court admitted the report into evidence. Further, the court stated the basis for its removal decision. The court explained: "[Father] does appear to acknowledge honestly that he feels that there are some issues which he continues to address. . . . The child is . . . over a year. . . . someone that is at a tender age still and is deserving of the protections that we need to afford him. The fact that father does and admits to having some anger issues, does admit that he has obtained some assistance in learning to deal and coping with those issues, and we have a child of this age is concerning to the court."

---

[8] Section 361, subdivision (d) provides, in relevant part: "The court shall make a determination as to whether reasonable efforts were made to prevent or to eliminate the need for removal of the minor from his or her home . . . . The court shall state the facts on which the decision to remove the minor is based."

This conclusion was well supported by the evidence.  Although father was already undergoing counseling at the outset of the dependency proceedings,[9] he still had the violent altercation with Raul that precipitated the dependency petition regarding Z.Z.  Although father had only spanked Z.Z. once, he at times indicated he still felt such physical discipline was appropriate, and he admitted using excessive physical discipline with his older children, such as the use of a belt, and beatings to such a degree that they left marks.  At one point he told a social worker he did not regret using such physical discipline with his older children.  In addition, mother and father were already living separately and father's contact with Z.Z. was somewhat limited.  Despite these arrangements, father had managed to place Z.Z. at risk of harm by his conduct when he spent time with Z.Z. at mother's home.  We also note there was an indication that in response to DCFS involvement with some of his older children, father sent them away to Mexico.  The evidence supported the court's conclusion that there were no reasonable means to protect Z.Z. without removing him from father's custody.

*In re Ashly F., supra,* 225 Cal.App.4th 803, does not suggest a different result. In *Ashly F.*, the children were removed from their home with both parents and placed with maternal relatives.  The jurisdiction and disposition report did not state what reasonable means for protecting the children short of removal had been considered, or what reasonable efforts DCFS made to eliminate the need to remove the children from their home.  (*Id.* at p. 808.)  The appellate court concluded there was insufficient evidence to support the juvenile court dispositional order removing the children from the parents' custody.  The court explained DCFS had not followed rules of court requiring a social study that discusses the reasonable efforts made to prevent or eliminate removal. Further, the juvenile court had not complied with section 361, subdivision (d), which requires the court to state facts on which the decision to remove a minor is based, and to consider the option of removing an offending parent from the home as a reasonable

---

[9]    At the disposition hearing, father's therapist testified he first began seeing father two or three years earlier.

means to protect the minor. On the record before the court it appeared that removing the offending parent may have been a reasonable option to protect the children. The court further noted the offending mother had expressed remorse and was enrolled in a parenting class, the father had completed a parenting class, and other reasonable means of protecting the children should have been considered such as unannounced visits or in-home counseling.

In contrast, here the jurisdiction and disposition report offered a description of the reasonable efforts DCFS made to prevent removal from father. Further, the court stated the basis for its removal decision on the record.[10] Significantly, removing father from the home was not an option to protect Z.Z. Father and mother lived separately, yet this had not protected Z.Z. from the effects of father's uncontrolled anger, as demonstrated in the incident with Raul, or from father's attempts to discipline Z.Z. in line with how he had disciplined his other children, which, in their case, led to excessive physical punishment. In addition, father did not clearly or consistently acknowledge the risk of harm his conduct posed to Z.Z., despite his ongoing therapy, which pre-dated the dependency proceedings.

Although mother had not allowed father to take Z.Z. or be alone with him, this had not prevented the spanking or the choking incident. Moreover, there was evidence mother said nothing to father after the spanking incident for fear of starting an argument; she told DCFS more than once that she was afraid of father; yet she subsequently recanted and said father was a "very calm person." In light of how Z.Z. had come to be placed at risk of harm, and his young age, the court could reasonably reject alternatives such as unannounced visits or in-home counseling. (*In re A.S., supra,* 202 Cal.App.4th at p. 248.) Substantial evidence supported the juvenile court's dispositional order.

---

[10]    To the extent the juvenile court's statements were not sufficient to meet the section 361, subdivision (d) requirement that it state the facts on which the removal decision is based, we would find the error harmless. (*In re J.S.* (2011) 196 Cal.App.4th 1069, 1078-1079.)

## B. Monitored Visits

We further find no abuse of discretion in the juvenile court order allowing father only monitored visits. (*In re Brittany C.* (2011) 191 Cal.App.4th 1343, 1356.) Even before the dependency proceedings, father did not have unmonitored visits as mother refused to let Z.Z. be alone with him. As explained above, father had a history of excessive physical discipline with his children, he had already used physical discipline with Z.Z. and felt it was the right solution to behavioral problems despite Z.Z.'s young age, and he admitted still having trouble controlling his anger. We can find no abuse of discretion in the court's order allowing father only monitored visits, and giving DCFS the discretion to liberalize them.

## DISPOSITION

The juvenile court's dispositional order is affirmed.

BIGELOW, P.J.

We concur:

RUBIN, J.

GRIMES, J.

13