Filed 5/5/21  In re C.J. CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re C.J., a Person Coming Under the Juvenile Court Law. | |
| KERN COUNTY DEPARTMENT OF HUMAN SERVICES,<br><br>        Plaintiff and Respondent,<br><br>                     v.<br><br>CHARLES J.,<br><br>        Defendant and Appellant. | F081983<br><br>(Kern Super. Ct. No. JD141266-00)<br><br><br>**OPINION** |

        APPEAL from a judgment of the Superior Court of Kern County.  Marcos R. Camacho, Judge.

        Lelah S. Fischer, under appointment by the Court of Appeal, for Defendant and Appellant.

        Margo A. Raison, County Counsel, and Bryan C. Walters, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

This case concerns 15-year-old C.J. According to C.J., his father, Charles J. (Father), physically abused him on multiple occasions. After a contested jurisdictional/dispositional hearing, the dependency court placed C.J. with his mother – who resided in Nevada apart from Father. (See Welf. & Inst. Code, § 361.2, subd. (a).)[1] The court then terminated C.J.'s dependency. (See *id.*, subd.(b)(1).) The court failed to state the basis for its ruling pursuant to section 361.2, subdivision (c).

Father argues the court's order terminating C.J.'s dependency is not supported by substantial evidence. We disagree.

Father also contends that the court's error under subdivision (c) of section 361.2 warrants reversal of the dispositional order. We conclude Father forfeited this claim of error by failing to raise it below.

Accordingly, we affirm the dispositional orders.

## FACTS

According to a police report, C.J. spoke with police officers on August 12, 2020, and told them he had run away from his home the week prior. C.J. was "located and returned" to his home on August 10, 2020. C.J. said he told officers "about abuse that had occurred in the residence in the past" at the hands of Father. Officers documented the incident, returned C.J. to Father's custody, and left at about 1:00 a.m. on August 11, 2020. C.J. said that once officers left, Father became upset and an argument ensued. According to C.J., Father "grabbed him by the neck using his right hand and was squeezing his neck causing him to become light headed." However, C.J. did not ultimately lose consciousness. C.J. said he sustained a "minor abrasion to the left side of his neck" from Father strangling him.

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise noted.

The next morning, Father made breakfast for himself and his girlfriend, but not for C.J. C.J. went to make food for himself, but Father told him not to eat Father's food. Father said the food in the house was his. C.J. ran away again, and someone called the police and Child Protective Services. The responding officer observed an abrasion on C.J.'s neck approximately one inch long, which looked similar to a scratch from a fingernail.

The responding officer also made contact with Father, who denied any physical confrontation with C.J. that evening. Father said that some food in the home was off limits to C.J., but there is food in the refrigerator and cabinets specifically for C.J. Father's girlfriend also denied any physical confrontation that night.

On August 12, 2020, the Kern County Department of Human Services (Department) placed then-15-year-old C.J. into protective custody. The Department also filed a dependency petition alleging C.J. was a child described in subdivisions (a) and (c) of section 300. The petition alleged that on August 11, 2020, Father had "choked" C.J. "until he nearly passed out." C.J. was "afraid to return to his father's home because 'He'll continue to choke me, hit me, and threaten me.' " The petition further alleged that in March 2020, C.J. "became distraught at this father's treatment towards him and stated, "I want to kill myself." Father handed him a knife and told him to "finish it."[2]

*Detention Hearing*

At a continued detention hearing on August 28, 2020, the court ordered C.J. detained from Father. The court delegated responsibility for placement of C.J. to the Department. The court ordered Father and mother were to have twice weekly visits for two hours with C.J.

The court also gave the Department discretion to release C.J. to his mother ahead of the jurisdiction/disposition hearing. Immediately upon granting the Department this

---

[2] Father denied C.J.'s version of events.

discretion, the court asked all counsel if there was "anything further?" All counsel, including Father's counsel, said, "No."

*September 2020 Social Study*

The Department filed a social study dated September 16, 2020.

The social study described a referral the Department had received on October 4, 2019. According to the unattributed referral, C.J.'s stepfather (and mother's partner), Gerald C., "choked" him "to the point where he was struggling to breath." C.J. reported no marks or bruises being left on his body.

C.J. told a family services specialist that Gerald had walked into his room and yelled at him to clean up. C.J. did not respond at first, but after Gerald yelled more, C.J. he got up and went to the bathroom. C.J. returned to his room and slammed the door. Gerald said he was hit by the door, but C.J. did not believe him. Gerald forced open the door and began choking C.J. Gerald forced C.J. onto the bed and pressed on his throat until he could not breathe. After approximately 15 seconds, C.J. was able to break free. Gerald pushed C.J. against a wall, and later "choked [C.J.] out" on a couch. Gerald moved C.J. from the couch to the floor, during which Gerald's knee contacted C.J.'s nose, causing it bleed. A third person then physically separated the two.

Gerald acknowledged that he "forcefully sat" C.J. down on the couch, but denied choking, body slamming or otherwise using excessive force against C.J. The family services specialist concluded the claim of child abuse was "unsubstantiated."

*October 2020 Social Study*

The Department filed another social study, dated October 5, 2020. The study recounted that on September 3, 2020, C.J. told social workers that he wanted to live with his mother. C.J. also said he did not want to visit Father. On September 18, 2020, C.J. again stated he did not want to visit Father.

C.J.'s mother told social workers that she had cared for C.J. most of his life. In September 2019, she had an extended hospital stay due to a foot injury. C.J. had

4.

arguments with Gerald and other household members. As a result, C.J.'s mother sent him to live with his Father. She believed C.J. would be returning to her home after the school year ended in May 2020.

In the social study, the Department recommended placing C.J. with mother and to then "terminate dependency."

*Jurisdiction/Disposition Hearing*

A jurisdictional/dispositional hearing was held on October 8, 2020 and the court received testimony.

Officer Nicholas Bell's Testimony

Bakersfield Police Officer Nicholas Bell testified that he came into contact with C.J. at his cousin's house on August 10, 2020. Bell did not observe any redness or bruising on C.J.'s neck, nor any other injuries on C.J.

C.J. told Officer Bell he had run away from Father's residence. C.J. said his Father had abused him on three prior occasions, in October 2019, December 2019 and March 2020.

Officer Bell told Father's girlfriend to record C.J. if he becomes aggressive towards her or Father. Bell returned C.J. to Father's custody.

S.S.'s Testimony

Father's girlfriend, S.S., testified that police brought C.J. home late on the night of August 10th or early in the morning on August 11th. S.S denied that any physical altercation occurred between Father and C.J. that night. Nor had she observed any physical altercation between Father and C.J. during the four months she lived with Father.

Father's Testimony

Father testified that one day in March 2020, C.J. "went on a tirade," saying that no one loved him. Father said he told C.J. he loved him and that he was "hard on him" because he is capable of doing more than he thinks. C.J. said he was going to kill

himself, so Father asked, "[W]hy?" C.J. eventually grabbed a knife and walked into a room. Father waited a few minutes for C.J. to calm down.[3] Father then went into the room. C.J. picked up the knife and said, "I was checking to see if you loved me," or something like that. Father said, "I do." C.J. threw the knife and Father hugged him. Father told C.J. he loved him. Father denied telling C.J. to "go ahead" or anything of that sort. Father did not think C.J. would actually "commit suicide."

Father denied having any physical altercation with C.J. in the days leading up to him running away. However, Father later said that he and C.J. were engaged in a playful session of "slap-boxing" during which time C.J. gave Father a black eye. Father denied assaulting or choking C.J. on August 11.

Father denied ever hitting his children out of anger or intimidation. However, Father acknowledged that he and C.J.'s brother Carlos had been "horsing around" in November 2018 during which time Carlos sustained a black eye. Father said Carlos hit himself in the eye while blocking a bunch from Father during a playful "slap-boxing" session.

C.J.'s Testimony

C.J. testified that he came to live with Father in October 2019. Prior to that, C.J. had been living with his mother and Gerald in Nevada. C.J. testified about the "incident" that led to his move:

> "I lost my anger [*sic*]; so I would slam the door, and then my stepdad came in trying to restrain me because he probably thought I was lying. So then whenever he came to restrain me, I was mad and trying to push him off me. And we ran downstairs as I tried to leave the house. He didn't want me to leave the house because it was like maybe 10:00, 11:00; so then he pulled me back into the house and started restraining me even more…."

C.J. denied that Gerald had strangled him. C.J. admitted to a social worker that he was "in the wrong during that incident." C.J. admitted that he told the authorities Gerald

___

[3] Later, Father testified he only waited around six seconds before following C.J.

6.

had choked him when in fact he had not. Later, C.J. said it "felt like he was choking me" but, in actuality, "he wasn't." While Gerald did put his hands around C.J.'s neck, Gerald was trying to stop C.J. from hurting him.

C.J. testified about the incident that occurred with Father in the late evening of August 10th into the morning of August 11th. C.J. said Father put one hand around his throat. C.J. pushed his hand off and ran away.

C.J. also testified about the incident where Carlos got a black eye. C.J. said that Carlos was eating in the living room when he was only supposed to eat in the kitchen. Father told Carlos to go eat in the kitchen. Carlos responded, "Bro, I'm just chilling. Leave me alone." Father approached Carlos, prompting Carlos to stand up. Father then hit Carlos in the eye. According to C.J., Father was not "playing around" with Carlos. C.J. denied that Father would ever playfully "slap-box" with Carlos or himself.

C.J. also testified about the incident involving a knife. C.J. made a statement about possibly committing suicide. Father told him, "You're not going to do it," and handed him a knife.

C.J. estimated Father hit him 15 times in the past. C.J. admitted Father had food for him to eat, just not food that he liked.

C.J. said he would not feel safe living with Father but *would* feel safe living with his mother and Gerald.

At the conclusion of testimony, the court stated that it credited C.J.'s testimony over Father's. The court found C.J. to be a person described by subdivisions (a) and (c) of section 300. The court ordered C.J. removed from Father and placed with Mother. The court then terminated dependency. Father appeals.

## DISCUSSION

### I. Defendant Forfeited his Claim of Error Under Subdivision (c) of Section 361.2

Section 361.2, subdivision (a) requires placement of a child with a nonoffending parent who desires custody unless it would be detrimental to the safety, protection, or well-being of the child. (§ 361.2, subd. (a).) If such a placement is made, the court may grant custody of the child to the nonoffending parent and terminate jurisdiction. (*Id.*, subd. (b)(1).) Alternatively, the court may grant custody of the child to the nonoffending parent and retain jurisdiction to supervise the nonoffending parent's custody. (*Id.* subd. (b)(2)–(3).)

Subdivision (c) of section 361.2 requires that dependency courts must make a finding "either in writing or on the record, of the basis for its determination[s] under subdivisions (a) and (b)." (§ 361.2, subd. (c).)

It is undisputed that, here, the court failed to state the required findings in writing or on the record. However, the Department contends Father forfeited this claim of error by failing to raise it below. We agree.

#### A. *Background*

After concluding the jurisdictional portion of the October 8, 2020, hearing, the court turned to the dispositional portion. The Department's recommendation for disposition was: placement of C.J. with his mother and termination of dependency. The Department's counsel "submitted" on its report and recommendation. The court then turned to Father's counsel who said, "I'm going to object and submit, Your Honor." Counsel offered no argument as to whether or why jurisdiction should be continued after placement with C.J.'s mother, as recommended by the Department. The court subsequently ordered placement with the mother and termination of dependency. After issuing the order – without the findings required by section 361.2, subd. (c) – the court

8.

asked each counsel if there was anything further. Father's counsel responded, "No, Your Honor."

### B. *Analysis*

The court's failure to state the basis for its determinations under subdivisions (a) and (b) of section 361.2 was clearly error. (§ 361.2, subd. (c).) However, Father failed to raise this claim of error below and thereby forfeited it for purposes of appeal.[4]

"[A] reviewing court ordinarily will not consider a challenge to a ruling if an objection could have been but was not made in the trial court. [Citation.] The purpose of this rule is to encourage parties to bring errors to the attention of the trial court, so that they may be corrected. [Citation.] [¶] Dependency matters are not exempt from this rule. [Citations.]" (*In re S.B.* (2004) 32 Cal.4th 1287, 1293, fn. omitted.)

When the court placed C.J. with his mother and ordered the termination of dependency, Father could have raised the issue of section 361.2, subdivision (c). Indeed, the court expressly invited counsel to raise any "further" issues. Had the issue been raised, the error could have been corrected then and there. Having failed to raise the issue to the trial court, it cannot be asserted on appeal.

We will next address Father's contention that the order terminating dependency was not supported by substantial evidence.[5]

## II. Father's Substantial Evidence Challenge Fails

### A. *Law*

"If a court orders removal of a child … the court shall first determine whether there is a parent of the child, with whom the child was not residing at the time that the

---

[4] Even if we were to reach the merits, the fact that Father did not present a solid reason for the court to retain jurisdiction would strongly suggest any error was harmless. (*In re J.S.* (2011) 196 Cal.App.4th 1069, 1079.)

[5] *This* contention was not forfeited. (Cf. *In re Isabella F.* (2014) 226 Cal.App.4th 128, 136.)

9.

events or conditions arose that brought the child within the provisions of Section 300, who desires to assume custody of the child." (§ 361.2, subd. (a).) "If that parent requests custody, the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child." (*Ibid.*)

If the court places the child with a nonoffending parent pursuant to section 361.2, it may then: (1) order the nonoffending parent become legal and physical custodian of the child, and terminate jurisdiction over the child; (2) order that the nonoffending parent assume custody, require that a home visit occur within three months, while maintaining jurisdiction over the child; or (3) order that the nonoffending parent assume custody subject to the continuing supervision and jurisdiction of the juvenile court, and possibly order services for one or both parents. (§ 361.2, subd. (b).)

Here, the court exercised the first option, ordering C.J. placed with his mother and then terminating jurisdiction. Father contends the court erred in choosing the option provided in subdivision (1) rather than subdivisions (2) or (3).

"We review a court's dispositional order for substantial evidence. [Citation.]" (*In re K.B.* (2015) 239 Cal.App.4th 972, 979.) "Our task is to determine 'whether evidence of reasonable, credible and solid value exists such that a reasonable trier of fact could find as the trial court did.' [Citation.] Thus, in order to succeed on appeal, mother must demonstrate that there is no evidence of a sufficiently substantial nature to support the court's order. [Citation.]" (*Ibid.*)

### B. *Analysis*

Father presents several arguments against the dependency court's termination of jurisdiction. First, he argues that he and C.J.'s mother "had past domestic violence in their relationship and often did not communicate well." But Father does not explain why a history of domestic violence between himself and C.J.'s mother would require

continuing jurisdiction over C.J., considering that she and Father do not live together. Indeed, they live in different states.

Father next points to the fact that he wanted to do counseling with C.J. However, while the court certainly *could have* continued its jurisdiction in order to provide services such as counseling to Father (§ 361.2, subd. (b)(3)), it was also authorized *not* to provide services and instead grant custody to the mother and terminate jurisdiction. (*Id.*, subd. (b)(1).) The fact that Father prefers one of subdivision (b)'s options over the one chosen by the dependency court does not warrant reversal.

Father notes that C.J. previously accused Gerald of physically abusing him. However, that allegation was deemed unsubstantiated and unfounded. Moreover, C.J. testified at the jurisdictional/dispositional hearing that, despite his earlier allegation, Gerald had in fact *not* choked him.[6]

Father submits that C.J.'s behavioral issues, such as "physical acting out," present risks to his safety. These behavioral issues, Father argues, "will not resolve on their own simply by moving him back to his other parent's home." However, C.J. testified that he would have "a lot of support" if he lived with his mother and Gerald. In contrast, C.J. testified that Father's violence made him afraid to live with Father and prompted him to run away. Thus, the evidence indicates that C.J.'s behavior *would* improve with his mother. Father's citation to evidence he believes supports a contrary inference is not persuasive on substantial evidence review.

Father's reliance on *In re Austin P.* (2004) 118 Cal.App.4th 1124 is misplaced. There, the dependency court found continuing supervision *was* necessary. On appeal, the father argued the court should have terminated jurisdiction under subdivision (b)(1). The

---

[6] Father points to several alleged inconsistencies in C.J.'s testimony and other facts he believes undermines C.J.'s retraction. However, on substantial evidence review, we do not consider whether there is evidence from which the dependency court could have drawn a different conclusion. (*In re Noe F.* (2013) 213 Cal.App.4th 358, 366.)

11.

*Austin P.* court *affirmed* the *continuance* of jurisdiction, listing several considerations supporting the court's decision such as the child's previously sporadic contact with the nonoffending parent.  (*In re Austin P.*, at p. 1134.)  In the present case, Father tries to argue that parallels to *Austin P.* warrant *reversal* of the *termination* of jurisdiction.  But *Austin P.* simply held that sufficient evidence supported the dependency court's decision to continue jurisdiction in that case.  It did not hold that when similar factors are present in other dependency cases, courts are *required* to retain jurisdiction.

## DISPOSITION

The dispositional orders are affirmed.


POOCHIGIAN, J.

WE CONCUR:


LEVY, Acting P.J.


MEEHAN, J.