Filed 8/16/23  In re Angel Z. CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re ANGEL Z., a Person Coming Under the Juvenile Court Law. | B319424 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. 20CCJP04563) |
| Plaintiff and Respondent, | |
| v. | |
| A.Z., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Marguerite Downing, Judge.  Affirmed.

Jesse McGowan, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Melania Vartanian, Deputy County Counsel, for Plaintiff and Respondent.

A.Z. (Father) appeals the jurisdictional findings and dispositional orders concerning his son, Angel Z., who was adjudicated a dependent of the juvenile court under Welfare and Institutions Code[1] section 300, subdivisions (b) and (j).  Father argues there was insufficient evidence to support the juvenile court's jurisdictional findings and the removal of Angel Z. from his custody.  Additionally, he requests the matter be remanded for compliance with the Indian Child Welfare Act of 1978 (ICWA) (25 U.S.C. § 1901 et seq.)  We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.  *Initial Investigation*

Angel Z. came to the attention of the Los Angeles Department of Children and Family Services (DCFS) shortly after his birth in September 2021, when a referral was made alleging both parents used marijuana, Angel Z. had been exposed to the drug during pregnancy, and the parents engaged in domestic violence.  The reporting party advised DCFS Mother had two older children removed from her care due to alcohol abuse and domestic violence between Mother and her prior partner; Mother and her children had not reunified.  Mother was participating in services but failed to apply the lessons learned. She was unable to set boundaries with her older children, and her visits were monitored.

DCFS met with Mother on September 21, 2021.  Although Father was present, DCFS was unable to interview him because he left for work.

---

[1]     All undesignated statutory references are to the Welfare and Institutions Code.

Mother denied currently using drug or alcohol.  She said she had taken a drug and alcohol test in late August 2021, was admitted to the hospital on August 30, and had missed three tests.  Mother reported being the victim of domestic violence by her prior partner.  According to Mother, the case involving her older children was opened due to domestic violence and alcohol abuse, but she did not have alcohol issues.  Mother was enrolled in individual counseling, domestic violence classes, and parenting classes.

Mother tested positive for marijuana on September 22, 24, and 28, 2021.[2]  She again claimed not to use marijuana or any other drug, and she claimed secondhand smoke could be responsible for the test results.  Mother said she had previously tested positive for marijuana and did not know why.  She admitted using marijuana in the past but said she had not smoked marijuana in 10 months.

DCFS left messages for Father on September 24 and 27, 2021, and then reached out to him via Mother.  DCFS interviewed Father on September 28, 2021.  He reported living with Mother and Angel Z.  He denied using drugs or alcohol.  He said he was willing to take a drug test but would have to request time off work.  Although the social worker offered to locate a testing location near his worksite, Father said he worked from 7:30 a.m. to 7:00 p.m. and did not know when he would have time to test.

Father told DCFS Mother was a good parent.  He denied Mother had any drug or alcohol issues and said he had never

---

[2]     Mother had also tested positive for marijuana August 19 and 24, 2021, during her pregnancy.

seen her use drugs or alcohol during their time together. Father transported Mother to her drug and alcohol tests for DCFS.

Father denied engaging in domestic violence with Mother and said they had " 'no problems or reasons to fight.' " Father told DCFS he and Mother communicated well and had no issues in their relationship. He reported being a victim of domestic violence in a previous relationship.

Father said he had no need for or interest in services such as parenting or counseling.

On October 4, 2021, the social worker working with Mother's other children related that Mother was not permitted unmonitored visits because of her lack of progress. Mother did not comprehend what she was learning in classes and seemed not to have matured at all.

DCFS left phone messages for Father on October 4 and 5, 2021. On October 6, 2021, Father answered his phone and DCFS asked him to take a drug test. He was hesitant and questioned the need to test. DCFS explained that in light of Mother's five positive tests, DCFS wanted to confirm his account that he did not use drugs. Father said he was unaware Mother used marijuana and he had never seen her use it. He agreed to test.

Father tested positive for marijuana on October 8 and 14, 2021. When the social worker discussed the results with him, he reiterated he did not use marijuana and said he did not know why he had tested positive. Father reported his neighbors used marijuana so he may have tested positive due to secondhand smoke.

Mother also tested positive for marijuana on October 6 and 14, 2021.

On October 18, 2021, paternal grandmother contacted DCFS and reported Mother had telephoned her at 2:00 a.m. or 3:00 a.m. that morning and said she and Father had been drinking and were now arguing. Paternal grandmother said she "heard yelling and the baby crying. They were swearing at each other. Then they both mutually told each other bad words. The aggression was mutual." Paternal grandmother could hear Angel Z. crying loudly, and she also heard Mother tell Father, "Don't pull me, don't throw me, you pulled me." Mother asked paternal grandmother to come calm Father down, but when she arrived, Father locked the door and the parents would not let her in.

On October 20, 2021, a social worker spoke with one of the family's neighbors. The neighbor said her husband had heard Mother and Father arguing, and over the past few nights, he heard the baby crying loudly. Father and Mother argued less than they had in the past. Both parents used to drink alcohol, but Father stopped when Mother became pregnant. Mother continued to drink and smoke. When Mother was intoxicated she verbally harassed the neighbor, and they had arguments. The neighbor said her husband almost had a physical altercation with Father because Father was insulting her.

The social worker knocked on the family's door but received no answer. She telephoned Mother, who said she was not home. The social worker told Mother she could hear her voice through the window. Mother said she lied to the social worker about being home because she was taking care of a child, which she knew was forbidden because of her open dependency case.

Mother let the social worker into the home, and when the social worker entered, she saw Father exit the bedroom. The social worker spoke with each parent about the new allegations.

Father said he did not know the last time he saw Mother consume alcohol. He stated, "[N]othing happened. We were not drinking, there is no abuse of anything. I have no reason to lie to you." Father blamed his jealous neighbors for the report DCFS had received, claiming they made false allegations to keep the parents apart. Father reported getting into a physical fight with a belligerent neighbor who called Mother and Father names.

Mother denied having a domestic dispute with Father. She denied the new allegations and attributed the report to the neighbors. Mother said Father had been in an altercation with one neighbor.

According to paternal grandmother, on October 23, 2021, Mother and Father were drinking and using drugs in their car around 2:00 a.m. Angel Z. was in the car with them. At approximately 3:00 a.m., Mother and Father dropped Angel Z. off in his car seat with paternal grandmother so they could continue drinking and using drugs. The parents were "fighting and arguing." At around 4:00 a.m., Mother and Father returned to pick up the baby. Paternal grandmother could smell alcohol on their breath when they picked up Angel Z. Their pupils were dilated and she believed they could be using cocaine or crystal methamphetamine. Paternal grandmother allowed the parents to take Angel Z. because she did not want them to get violent and try to hurt her.

Paternal grandmother told DCFS Mother admitted she and Father lied to DCFS about the domestic violence incident and said they would continue to deny it.

On October 24, 2021, a neighbor heard the parents arguing at 1:00 a.m. Father, angry the baby was crying when he wanted to sleep, told Mother to "shut the fucking baby up." The baby

cried a lot that night. The baby did not cry all the time, but when he did, it was excessive. The neighbor believed the parents used marijuana because the smell coming from their residence was very strong.

On October 29, 2021, DCFS received a call reporting that Mother and Father were "drugged up" and intoxicated. The parents used marijuana and were caring for Angel Z. while under the influence. According to the reporting party, Mother and Father began to argue. Father pushed Mother out of the house and locked himself inside with Angel Z.

## II.   *Petition and Detention*

Angel Z. was placed in protective custody on November 1, 2021. He was less than two months old. On November 3, 2021, DCFS filed a petition alleging he was subject to juvenile court jurisdiction under section 300, subdivisions (a), (b)(1), and (j). Under each subdivision, DCFS alleged Mother and her prior partner had both engaged in domestic violence.

Under section 300, subdivisions (b)(1) and (j), DCFS alleged Mother had a history of substance abuse, used marijuana during her pregnancy, and was presently abusing alcohol and marijuana. Additionally, Mother's older children had become dependents due to her substance abuse. DCFS alleged Mother had been under the influence of alcohol and marijuana while Angel Z. was in her care and supervision, and that her substance abuse interfered with her ability to care for and supervise him.

Under section 300, subdivision (b)(1), DCFS alleged Father had a history of substance abuse and was currently abusing marijuana and alcohol. He had tested positive for marijuana twice and had been under the influence of alcohol and marijuana while caring for Angel Z. DCFS alleged Father's substance abuse

7

interfered with his ability to provide regular care and supervision to Angel Z.

The court detained Angel Z. on November 9, 2021. Angel Z. was soon placed in the home of paternal grandfather and paternal step-grandmother.

III. *Pre-Adjudication Investigation*

A. Mother

Mother denied ever being violent with her ex-partner and said she had been the victim. She acknowledged her arrest for intimate partner violence with injury, and admitted her older children were dependents due to her "engaging in violent conduct with" her ex-partner. Mother denied domestic violence with Father and said, "Things with [Father] are fine. He has never done anything to me."

Mother told DCFS she had not smoked marijuana or consumed alcohol since her older children were removed from her custody in August 2020. She said she did not know how she tested positive for drugs because she had not used them.

Mother denied the allegation that she had a history of substance abuse and was a current abuser of marijuana and alcohol, rendering her incapable of regular care for Angel Z. She denied abusing marijuana while pregnant with Angel Z. or being under the influence when he was in her care. Mother acknowledged her seven positive drug tests between August and October 2021, but she maintained she had tested negative on tests by her service provider. Mother admitted drinking a tea made from marijuana leaves while she was pregnant to help her sleep and eat.

Mother denied Father abused marijuana and alcohol. She said she had never seen him under the influence or smoking in

8

her presence. She denied Father had been under the influence of alcohol and marijuana while taking care of Angel Z. She denied that Angel Z. was endangered by Father's substance abuse.

Mother was enrolled in parenting, domestic violence, and substance abuse programs, drug testing, and individual therapy, and she provided a certificate of completion for a domestic violence program. Mother told DCFS Father was enrolled in classes.

B.     Father

Father said he began using marijuana when he was about 16 years old, stopped for a period of time, and then resumed using at age 21. He used to smoke about once per week, always outside. The last time he smoked marijuana was in September 2021.

Father denied the petition's allegation that he had a history of substance abuse and currently abused marijuana and alcohol, rendering him incapable of providing Angel Z. regular care and supervision. He said he had not been under the influence while caring for Angel Z. Father acknowledged testing positive for marijuana twice, saying, "Yes, but I was about 30–40%." He denied substance abuse that endangered Angel Z. Father denied current substance use.

Father denied Mother used marijuana while pregnant with Angel Z. He denied the allegation that Mother had a history of substance abuse and currently abused marijuana and alcohol, rendering her incapable of caring for Angel Z. said that "at no moment" was Mother under the influence while caring for Angel Z. Father denied that Mother's substance abuse endangered Angel Z. or interfered with providing care to him. To Father's knowledge, Mother was no longer smoking or drinking. He knew

9

Mother tested positive for marijuana five times, but he maintained that there were negative tests at another location.

Father denied any domestic violence and said he and Mother got along great. Father said he had begun receiving services; currently he was enrolled in parenting, individual and couples therapy, and a substance abuse program with weekly drug testing.

In January 2021, DCFS reported to the court that Father had refused to make himself available to meet with the social worker, stating he was busy and working.

C.    Other Interviews and Information

On January 13, 2022, paternal grandmother informed DCFS that at least once per week, Mother would telephone her, say she and Father were arguing, and ask her to take care of Angel Z. Arguments typically related to finances, and she could usually hear them arguing over the phone. Paternal grandmother regularly looked for marks or bruises on their faces, but she did not see any.

Paternal grandmother told DCFS that on the day the parents picked Angel Z. up from her in the middle of the night, their clothes smelled of marijuana. On several occasions they had admitted they used marijuana, but that day it was obvious from the way the parents smelled.

Paternal grandmother thought the couple was better since Angel Z. was removed from their custody, and she thought they understood they needed to change. The parents told her they were not using drugs.

Mother tested negative for drugs on November 10, 15, 24, and 30, 2021. Father enrolled in drug testing on November 29, 2021, but he failed to appear for his first test on December 9,

10

2021.  His tests on December 14, 22, and 29, 2021, as well as January 5 and 12, 2022, were negative.

Paternal grandfather and paternal step-grandmother said they used to test Father for drugs when he was a teenager because of his marijuana use.

The social worker on the case involving Mother's older children said Mother was in therapy but did not apply what she learned.  Mother's counselors had only positive things to say about her; but while she was testing clean on their tests, she was testing positive for marijuana for DCFS.

Mother's counselor told DCFS she had told Mother she needed a signed authorization before she could speak with DCFS.  The counselor never contacted DCFS to complete the interview, but on December 9, 2021, another therapist at the agency wrote a letter confirming Mother's enrollment and describing her progress and participation in individual and group psychotherapy, individual rehabilitation, and case management.

Service logs showed Mother called the police in March 2021, saying Father hit her.  Mother recanted when officers arrived and claimed the altercation was verbal.  The logs also reflected Mother called the police in July 2021, stating that a neighbor threatened her with a knife.  The police noted it was mutual combat and an ongoing issue between the parties.

At the detention hearing on November 9, 2021, Mother and Father were granted monitored visitation, a minimum of three times per week for three hours per visit.  The court told the parents during the hearing they were not to visit Angel Z. together.  However, Mother and Father visited Angel L. together every Sunday for two hours.  They took turns carrying Angel Z. and spending time with him.  Mother and the caregiver said they

11

were unaware of the prohibition on joint visits.  The parents were informed November 30, 2021, that they were not allowed to visit together.

III.    *Jurisdictional and Dispositional Hearing*

On January 27, 2022, the court conducted the jurisdictional and dispositional hearing.  As to Father, the court sustained the allegation concerning Father's failure to protect Angel Z. pursuant to section 300, subdivision (b)(1).  The court found true the allegations against Mother under section 300, subdivisions (b)(1) and (j).  The court removed Angel Z. from the parents' custody and granted them reunification services and monitored visitation.

## DISCUSSION

I.    *Sufficiency of the Evidence to Support Jurisdiction*

Father argues the jurisdictional findings against him were not based on sufficient evidence.  Although Angel Z. will remain a dependent child of the juvenile court regardless of our decision here because of the uncontested jurisdictional findings concerning Mother, Father's appeal remains justiciable.  (*In re D.P.* (2023) 14 Cal.5th 266, 283 ["where a jurisdictional finding 'serves as the basis for dispositional orders that are also challenged on appeal' [citation], the appeal is not moot"].)

Jurisdictional findings are reviewed for substantial evidence and will be affirmed where there is reasonable, credible evidence of solid value to support them.  (*In re Jonathan B.* (2015) 235 Cal.App.4th 115, 119.)  " ' "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the

12

court's determinations; and we note that issues of fact and credibility are the province of the trial court." [Citation.] "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court. [Citations.] ' "[T]he [appellate] court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence . . . such that a reasonable trier of fact could find [that the order is appropriate]." ' " ' " (*In re I.J.* (2013) 56 Cal.4th 766, 773.) "Thus, we do not consider whether there is evidence from which the juvenile court could have drawn a different conclusion but whether there is substantial evidence to support the conclusion that the court did draw." (*In re M.R.* (2017) 8 Cal.App.5th 101, 108.)

Under section 300, subdivision (b)(1), the court may exercise jurisdiction over a child who has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness as a result of the failure of the parent to adequately supervise or protect the child or to provide regular care for the child due to the parent's substance abuse. (§ 300, subd. (b)(1).)

Father first argues there was no substantial evidence to support the finding he was a substance abuser. Father contends he cannot be found to be a substance abuser in "the absence of a medical diagnosis of substance abuse, and a lack of evidence of life-impacting effects of drug use." (*In re Rebecca C.* (2014) 228 Cal.App.4th 720, 726.) There is no medical diagnosis here, and Father says there was no evidence of any "life-impacting effects" related to his use of marijuana and alcohol. Father acknowledges there is "some evidence" of domestic violence involving Mother,

13

but says there is no indication in the record that Father's use of marijuana or alcohol played a factor in the domestic violence.

We disagree. The altercation paternal grandmother heard over the phone involved alcohol. Mother told paternal grandmother she and Father had been drinking. They were yelling and arguing viciously, and Angel Z. was crying in the background. Mother said to Father, "Don't pull me, don't throw me, you pulled me." She asked paternal grandmother to come over to calm Father down. Paternal grandmother said these calls from Mother happened at least once per week. On another occasion it was anonymously reported to DCFS that Mother and Father used alcohol and marijuana and were "drugged up" and intoxicated while caring for Angel Z. The parents began arguing, and Father pushed Mother out of the house.

Additionally, the evidence shows Father was a longtime user of marijuana who failed to take responsibility for his alcohol and marijuana consumption. One may draw a reasonable inference from his denials that he failed to recognize he had a substance abuse problem. Father's denial that he used alcohol and marijuana cannot be squared with his positive drug test and the numerous reports of Father drinking and using marijuana. His later admission that he did use marijuana but stopped in September 2021 is contradicted by the evidence of his drug use in October 2021. In short, it was reasonable for the juvenile court to conclude Father was not telling the truth about his marijuana and alcohol consumption and to conclude he was attempting to conceal substance abuse. (*In re K.B.* (2021) 59 Cal.App.5th 593, 601 ["The juvenile court was entitled to conclude the mother had been transparently dissembling about her drug use. A reasonable inference was the mother was trying to hide her

14

ongoing addiction. The trial court was entitled to draw this reasonable inference.") Father's negative drug tests before the jurisdictional hearing do not alter our conclusion that substantial evidence supports the juvenile court's finding of substance abuse.[3]

Father next argues there was no evidence he cared for Angel Z. while under the influence of marijuana and alcohol. However, Angel Z. was in the parked vehicle with Mother and Father while they used marijuana and alcohol, and they had dilated pupils, breath that smelled of alcohol, and clothes that smelled of marijuana when they picked up Angel Z. from paternal grandmother. Father insists those facts do not show he was then "under the influence," but this too is a reasonable inference from the evidence. Moreover, it is a reasonable inference that the parents were caring for Angel Z. on the night they were drinking, began to argue, and Father became physical with Mother, as the family shared a bedroom, it was the middle of the night, and

---

[3] Because Angel Z. is not yet six years old and is therefore of tender years (*In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1219), "the finding of substance abuse is prima facie evidence of the inability of [the] parent . . . to provide regular care resulting in a substantial risk of physical harm." (*In re Drake M.* (2012) 211 Cal.App.4th 754, 766-767, disapproved on other grounds in *In re D.P., supra*, 14 Cal.5th at p. 283.) Here, the tender years presumption applies and satisfies DCFS's burden to prove Father is unable to provide regular care, resulting in a substantial risk of physical harm. However, as the continued validity of the tender years presumption is before our Supreme Court in *In re N.R.*, review granted August 24, 2022, S274943, we do not rely on the presumption to find jurisdiction appropriate here.

15

Angel Z. could be heard crying loudly during Mother's call to paternal grandmother asking for help calming Father down.

Father argues that even if he did care for his son while under the influence on one occasion, the evidence does not demonstrate a current risk of harm to Angel Z. from his marijuana or drug use. We disagree. Father started using marijuana when he was 16 years old and was subjected to drug testing even as a teenager due to his marijuana use. There were many reports that Mother and Father regularly drank and used marijuana, and the reports that he was using drugs and drinking in October 2021 belied his claims that he did not drink alcohol and had stopped smoking marijuana in September 2021.

Additionally, Father attempted to avoid, or at least delay, drug testing. When asked to test, he hesitated and claimed he would have to ask for time off work. Then he said he could not find time to test, even though Father was the one who took Mother to her drug tests and the social worker offered to find a testing location near his work. After Father's two positive tests in October 2021, he did not enroll in a drug testing program until November 29, 2021, and he was a no show for his first scheduled test on December 9, 2021. Father blamed his positive tests on secondhand smoke and minimized the results as "about 30–40%." Even though Mother tested positive many times for marijuana, including while she was pregnant with Angel Z., Father continued to deny she used marijuana, indicating he did not take substance use seriously or think it a danger from which his son needed to be protected.

Father also attempted to evade investigation. He left the residence before being interviewed during the parents' initial contact with DCFS. Several times he did not answer the social

worker's calls or respond to her messages. He was in the room with Mother while she lied to a visiting social worker that she was not home. By the time the jurisdictional hearing was approaching, Father would not make himself available to DCFS for an interview, saying he was "busy and ha[d] been also working." Father's avoidance of DCFS during the investigation supports the juvenile court's conclusion that his substance abuse posed a risk to Angel Z. (See *In re E.E.* (2020) 49 Cal.App.5th 195, 213–215.)

Given Father's longtime use of drugs and alcohol, his dishonesty about the extent of his drug and alcohol use, his denial of Mother's drug use and apparent indifference to her substance use around Angel Z., and his avoidance of DCFS, there was substantial evidence from which the court could infer there was a substantial risk Father would again take care of his child while under the influence. The evidence was sufficient to support the finding against Father under section 300, subdivision (b)(1).[4]

II.    ***Removal Order***

Children may not be removed from parental custody unless there is clear and convincing evidence of a substantial danger to their physical health, safety, protection or physical or emotional well-being and there are no reasonable means by which they can be protected without removal. (§ 361, subd. (c)(1).) "A removal order is proper if based on proof of parental inability to provide

---

[4]    We deny DCFS's request for judicial notice of a minute order terminating the parents' reunification services as it is not relevant to the determination of this appeal. (*People ex rel. Lockyer v. Shamrock Foods Co.* (2000) 24 Cal.4th 415, 422, fn. 2 ["any matter to be judicially noticed must be relevant to a material issue"].)

17

proper care for the child and proof of a potential detriment to the child if he or she remains with the parent. [Citation.] 'The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child.' [Citation.] The court may consider a parent's past conduct as well as present circumstances." (*In re N.M.* (2011) 197 Cal.App.4th 159, 169–170, disapproved on other grounds by *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011–1012.) However, removal cannot be based solely on past abuse; it requires an "ongoing or future danger" to the child. (*In re A.E.* (2014) 228 Cal.App.4th 820, 826.)

A removal order is reviewed for substantial evidence. (*In re Hailey T.* (2012) 212 Cal.App.4th 139, 146.) "When reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true. In conducting its review, the court must view the record in the light most favorable to the prevailing party below and give appropriate deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Conservatorship of O.B.*, *supra*, 9 Cal.5th at pp. 1011–1012.)

Father concedes the evidence was sufficient for the juvenile court to conclude there was an ongoing, unresolved domestic violence problem. But he contends the court erred in removing Angel Z. from his custody because DCFS failed to prove there were no reasonable means by which Angel Z. could be protected short of removing him. Specifically, he contends Angel Z. could

18

have been returned safely to him on the condition that he reside with paternal grandfather and step-grandmother with whom Angel Z. was placed, as he requested at disposition. Alternatively, Father contends Angel Z. could have been placed with him on the condition they live with paternal grandmother, although he did not request this in the juvenile court.

Father fails to demonstrate a residency requirement would have alleviated the concerns for Angel Z.'s safety. Father had a history of physical altercations with Mother and others. He also locked his door and would not let paternal grandmother inside the home when she came to defuse the physical altercation taking place between Mother and Father in the presence of a crying Angel Z. This behavior is similar to the anonymous report that when he was under the influence and angry Father pushed Mother out of the house and locked himself and Angel Z. inside. Having another person or people at the residence would not ensure Angel Z.'s safety with a parent who, when he was intoxicated and angry, was willing to physically prevent family members from having access to Angel Z. Moreover, Father was sufficiently intimidating when he was using drugs and alcohol that paternal grandmother, who was highly concerned for and very protective of Angel Z., still returned Angel Z. to him when he appeared to be under the influence of alcohol and marijuana because she was afraid he would hurt her if she did not. These behaviors, as well as Father's unresolved substance use and his unwillingness to cooperate with DCFS, made less drastic solutions short of removal insufficient to protect Angel Z.

Father argues the court's removal decision was based on erroneous findings that Father refused to cooperate with DCFS, refused to be interviewed, and refused to engage in services.

These findings were supported by substantial evidence. Leading up to the jurisdictional hearing, Father refused to make himself available to DCFS for an interview, stating he was busy and working. He had been somewhat cooperative earlier in the course of the matter, but even prior to his refusal to speak with DCFS he failed to return calls, left the home before being interviewed, was reluctant to drug test, and was with Mother while she attempted to deceive DCFS about her location in order to conceal that there was a child in her home. As for services, Father told DCFS at the start of the investigation he had no interest in services. He told DCFS later he had enrolled in services, but he does not identify, nor can we locate, any evidence in the record that he actually participated in services beyond submitting to five drug tests in December 2021 and January 2022. It is true, as Father points out, that the jurisdictional report stated Father was receptive to services and cooperative with DCFS, but that report was filed on December 7, 2021, shortly after Father's enrollment in drug testing, before his no-show for a test, and before Father stopped speaking with DCFS.

Father faults DCFS for failing to explore a residency requirement. However, as discussed above, the risk Father posed would not have been alleviated by a change of residence. Father refused contact with DCFS, had a history of evasion and dishonesty about both his and Mother's drug and alcohol use, never acknowledged or expressed insight into the risk of serious harm to which he had subjected his son, and, while under the influence and in an altercation, denied others access to Angel Z. This is in addition to his continued denial of domestic violence despite evidence to the contrary. Placement with Father,

regardless of where he lived, would have been insufficient to protect Angel Z.

Father points out the juvenile court did not address his request that Angel Z. be returned to his custody with a residency requirement. The court was required to state the facts upon which the decision to remove Angel Z. was based. (§ 361, subd. (e).) It is arguable that the same facts that supported removing Angel Z. from Father's custody also demonstrated that a residency requirement was insufficient to protect him. Father contends, however, based on *In re J.S.* (2011) 196 Cal.App.4th 1069, that we should consider the failure to expressly address Father's proposed disposition as a failure to consider it. But in *In re J.S.*, the court said that while "the doctrine of implied findings may be given limited scope where an express finding is required," that does not eliminate "the rule of harmless error. Before any judgment can be reversed for ordinary error, it must appear that the error complained of 'has resulted in a miscarriage of justice.' " (*Id*. at p. 1078.)

To any extent the court erred, we see no miscarriage of justice arising from the trial court's unexplained decision not to place Angel Z. with Father in either grandparent's home. Clear and convincing evidence supported the court's decision that no reasonable means existed of protecting Angel Z. from Father other than removal. Father's false denials, his continued use of marijuana and alcohol despite telling DCFS he had quit, his unresolved domestic violence issues, his failure to take responsibility for supervising Angel Z. while under the influence, his denial of access to Angel Z. when intoxicated and angry, and his refusal of contact with DCFS all support the court's

21

conclusion that Angel Z. could not be protected absent removal from Father's custody.

DCFS carried its burden to show that at the time of disposition, there were no reasonable means of protecting Angel Z.'s health and safety without removing him from Father. Based on the record and taking into account the clear and convincing burden of proof required for removal (see *Conservatorship of O.B.*, *supra*, 9 Cal.5th at pp. 1011–1012), we conclude substantial evidence supports the juvenile court's order removing Angel Z. from Father's custody.

## III. *ICWA*

ICWA reflects a congressional determination to protect American Indian children and to promote the stability and security of Indian tribes and families. (25 U.S.C. § 1902; *In re Austin J.* (2020) 47 Cal.App.5th 870, 881 (*Austin J.*), superseded by statute on other grounds as stated in *In re E.C.* (2022) 85 Cal.App.5th 123, 147.) To that end, ICWA established unique standards for the removal and placement of American Indian children. (25 U.S.C. § 1901 et seq.) Central to the protections of ICWA are procedural rules to determine whether an Indian child is involved. Federal regulations implementing ICWA require state courts to ask participants in child custody proceedings whether the participant knows or has reason to know the child is an Indian child. (25 C.F.R. § 23.107(a) (2023).)

State law lays out the requirements for initial inquiry and further inquiry. (*Austin J.*, *supra*, 47 Cal.App.5th at p. 883.) Initial inquiry includes the following: DCFS must ask "the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be,

22

an Indian child." (§ 224.2, subd. (b).) At each participant's first appearance at dependency proceedings, the court must ask whether the participant knows or has reason to know the child is an Indian child. (*Id.*, subd. (c).)

Here, both parents denied Indian ancestry during their initial interviews with DCFS and filed ICWA-020 forms denying Indian ancestry on their first appearance in juvenile court. There is no evidence in the record that prior to disposition DCFS inquired of any extended family members, specifically either paternal grandparent, whether Angel Z. is or may be an Indian child. On appeal, Father asks that the matter be remanded for an inquiry in compliance with ICWA and related California law.

We take judicial notice of the juvenile court's December 21, 2022 minute order. (Evid. Code, §§ 451, 459.) The court ordered DCFS to "interview/attempt to interview all extended family members, including the paternal grandparents, about whether the child, Angel Z[.], is, or may be, an Indian child as required by . . . section 224.2(b)." Additionally, the court ordered DCFS to document all its efforts and submit a written report on its results. The court stated it would make further findings regarding ICWA after reviewing the report and determining whether DCFS interviewed all available extended family members.

As the court has now ordered the ICWA-compliant investigation Father seeks on appeal, we can provide him no effective relief on this issue. "[A]ll we could order in resolving this appeal is that the Department and juvenile court fulfill their inquiry and notice obligations under ICWA and related California law." (*In re Baby Girl M.* (2022) 83 Cal.App.5th 635, 638–639.) Because DCFS has been ordered by the juvenile court to do just that, this issue is moot. (*In re N.S.* (2016) 245 Cal.App.4th 53, 60

23

["[T]he critical factor in considering whether a dependency appeal is moot is whether the appellate court can provide any effective relief if it finds reversible error"].)

## DISPOSITION

The judgment is affirmed.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

STRATTON, P. J.

We concur:

WILEY, J.

VIRAMONTES, J.