[No. H036274. Sixth Dist. June 22, 2011.]

In re J.S., a Person Coming Under the Juvenile Court Law.
SANTA CLARA COUNTY DEPARTMENT OF FAMILY AND
CHILDREN'S SERVICES, Plaintiff and Respondent, v.
R.S., Defendant and Appellant.

## COUNSEL

John L. Dodd, under appointment by the Court of Appeal, for Defendant and Appellant.

Miguel Marquez, County Counsel, and Julie F. McKellar, Deputy County Counsel, for Plaintiff and Respondent.

## OPINION

RUSHING, P. J.—The Santa Clara County Department of Family and Children's Services (Department) filed this proceeding to bring J.S. within the jurisdiction of the juvenile court under Welfare and Institutions Code section 300.[1] The court granted physical custody to J.S.'s biological father, Thomas N., and terminated its jurisdiction. The mother, R.S., brings this appeal, contending that the court committed reversible error by terminating jurisdiction without making an express finding in support of that decision, as required by section 361.2, subdivision (c) (section 361.2(c)). We hold that although the court erred, there is no reasonable probability that it would have reached a different result in the absence of the error. Accordingly, we will affirm.

### BACKGROUND

A highway patrolman reported that on the evening of May 18, 2010, he stopped to investigate a seemingly disabled vehicle along a freeway in San Mateo. The driver, R.S., reported that she had run out of gas. With her in the car were J.S., about five and one-half years old, and his half sister, J.C., about four years old. The children told the officer that their mother had been yelling at and hitting them earlier in the evening. R.S. refused to answer the officer's questions about bruises and cuts he saw on the children. He arrested her and, in an inventory search, found methamphetamine powder in her purse.

---

[1] All statutory citations are to the Welfare and Institutions Code.

A petition was filed on May 20, 2010, under section 300, alleging that J.S. was within the jurisdiction of the juvenile court. A parallel proceeding was apparently commenced as to J.C. On May 27, 2010, both children were placed with J.C.'s father. On that date the whereabouts and identity of J.S.'s father remained unknown.[2] By the next day the Department had identified him as Thomas; on that date a worker contacted him about J.S.'s "current status." He responded on June 4, and thereafter stayed in frequent contact with the worker.

On June 11, the Department filed an amended petition naming Thomas as J.S.'s father. The Department reported that J.S. was the subject of an existing case in the family law court, filed by the County of Santa Clara less than three weeks after he was born. In that matter the court had adjudged Thomas to be J.S.'s father based on genetic testing. It had ordered him to pay child support, which he had been doing.

R.S. told a social worker that Thomas was married when they met; they had seen each other for about a year; he was present at [J.S.]'s birth; but he ultimately went back to his marriage. She asserted that Thomas had no relationship with J.S. and had seen him only two or three times since the birth. Thomas said that when he and R.S. had become involved he was indeed married, but had temporarily separated from his wife, to whom he had ultimately returned after being "scared" by R.S.'s "wild side." He had taken R.S. to the hospital for, and was present at, J.S.'s birth. For a while he had been seeing J.S. for about one day every two months, but these meetings had ceased when he lost the ability to contact R.S.

Thomas told the social worker said he was "thankful to have [J.S.] and ha[d] been paying child support," but that R.S. had not wanted to "give him the child," and that he had "let it go" because he had "wanted things to 'be cool' with everyone." Now, he said, he was "ready to fight for [J.S.] and would like full custody," he loved and missed J.S., and he believed J.S. "really misse[d] him." He also said that although his wife had not met J.S., she was "very excited" about bringing him into their family. They had two sons, ages 12 and 8, who had seen J.S. two or three times. Thomas was "willing to complete program[s] and services as long as it doesn't conflict with work," but had "no idea what services he can benefit from as his children are healthy and doing well in school."

---

[2] R.S. had failed to supply this information on May 19, telling a social worker that she had "full legal custody" of J.S. and "no contact with the father." The social worker "submitted a request for location services," found his "information," and contacted him.

Despite these early favorable indications the Department was not initially prepared to recommend that J.S. be placed with Thomas. Apart from the inability to perform a complete assessment, the responsible social worker wrote, it did not appear that J.S. recognized Thomas as a father figure. "On 6/9/2010," she wrote, J.S. "informed this worker that the only father he knows is 'Tonton,' " i.e., his half sister's father. At that time, the Department recommended supervised visits between J.S. and Thomas twice a month, with discretion in the Department to increase the frequency. The worker wrote that J.S. "appears to want[] male role models in his life," and having visits with Thomas would allow him to "get to know his biological father and build a relationship with him."

On June 17 a worker visited Thomas's home, and on June 18 a supervised visit took place, at the conclusion of which J.S. called Thomas "daddy." The worker gave a generally favorable account of Thomas's home as a potential placement, but still found placement with Thomas not presently in J.S.'s best interests because of the lack of an existing relationship. She recommended relevant services "to help [J.S.] and his father develop a relationship and a bond with each other and to support [Thomas] in understanding [J.S.]'s physical, development, education, and emotional/mental development and needs." She recommended that the court "set an interim review hearing in 90 days to look at possibly placing [J.S.] with his father."

By July 7, 2010, J.S. had been visiting regularly with Thomas and, usually, Thomas's two other sons. Everyone seemed to enjoy the visits, and at their conclusion J.S. often asked if he could go with Thomas, whom he was now calling "daddy." By July 22 the worker was recommending "that legal and [physical] custody of J[.S.] [be] awarded to" Thomas, accompanied by "custody and visitation orders," and that the court "terminate[] its jurisdiction over the family and dismiss[] [the] dependency [proceeding]."

At a hearing on July 27, counsel for R.S. stated her client's opposition to the "recommendation to dismiss [J.S.]'s case," and the parties agreed to submit to mediation on August 18.

On August 21, 2010, J.S. was placed in Thomas's home.

On November 1 the court commenced a contested disposition hearing. From the outset all participants appeared to anticipate that J.S. would be placed in Thomas's home with visitation rights reserved to R.S. The sole points of contention appear to have been (1) the nature of the visitation order and (2) whether the court should terminate its jurisdiction or, instead, exercise

ongoing supervision over the matter. R.S.'s attorney insisted that jurisdiction should be retained to ensure that services were made available to both R.S. and Thomas. The court was strongly inclined to this view in the beginning, telling counsel for the Department, "I don't see what else you could present that would persuade me to agree to dismiss the case at this point." The court made clear, however, that the object of its concern was to ensure that the family received the services it needed to engender a healthy relationship between the child and both parents. Counsel for the Department argued that this concern was adequately addressed by Thomas's entry into a voluntary services agreement under which he would receive such services as the Department considered desirable. Counsel also noted that the companion dependency case would remain open, so that R.S. would "continue to have services available by way of the sibling's case plan." Counsel for Thomas expressed general agreement with this view but suggested the possibility of keeping the case open for "a little transitional period of time here to monitor mom's visitation."

This suggestion, combined with the Department's arguments, seemed to shift the court's focus to visitation: "[S]o I was thinking, not necessarily, you know, of keeping the case for purposes of going the full route FR/FM[,] [i.e., family reunification or family maintenance,] . . . but really more in preparation for the visits to take place." The court asked counsel for the Department where the authority would reside to cause R.S. to complete a hypothetical parenting class if she proved reluctant to do so, and counsel replied that the court would possess that authority "in connection with the sibling's case which obviously has a cross over [e]ffect on this case." The court also asked whether there were any "services that would benefit reestablishment of the bond with mother and child that [are] not included already in her case plan with siblings [sic]?" Counsel for the Department replied that "every service that we can offer through having an open case we can also offer through a voluntary family maintenance. And every service that we've discussed today would also be available under voluntary family maintenance context."

Counsel for R.S. objected that the cited voluntary arrangement was "between [Thomas] and the Department, it has nothing to do with my client." She argued that if Thomas decided not to comply with the arrangement, "there is no remedy, other than the Department to file a petition which it wouldn't." She noted that if the case were dismissed, none of the parties would any longer have legal representation. Thus if R.S. were denied "a chance to participate in therapy with [J.S.], her remedy is to go to family court on her own." Counsel for the Department rejoined that there was no basis in the record to suspect that Thomas would fail to fully cooperate, and

that if he did so remedies could indeed be found in the family law court, which was geared to assist self-represented litigants.

At the conclusion of this exchange the court remained unconvinced that it should divest itself of jurisdiction.[3] The hearing resumed a week later, with the court receiving testimony from R.S. and then hearing arguments of counsel. At the conclusion of this session the court again expressed the belief that the case required some kind of continuing supervision. It acknowledged that the law "favor[s] permanency for children because the court[] [is] not to keep a case open beyond what is necessary so that this young boy can get on with his life." However, it continued, "I don't find that closing the case now with the way that things are between the parents . . . is in his best interest. [¶] I believe that this child's life would be better, would be made better with the court's oversight into the visitation. The therapy, perhaps I would like to see therapeutic visitation happening at some point, move it to family therapy. The reality is that this child is going to grow up with the danger of having attachment problems, feelings of abandonment which is common with children, and I'm not comfortable that in three months we have seen this child with father, no reflection on you [Thomas], I think you are doing everything you have been asked to do and more. You are willing to do voluntary services. The point is that he is six-years old. If he was a toddler, had little memory of there would be less of a detriment to him."[4]

However, after further colloquy concerning the form of order contemplated, the court said, "Let me think this through as to what the intent is. And if provided the law allows the court's intervention for the limited purpose of monitoring the visitation, that is what I had in mind."

The court continued the matter for two days, inviting counsel for the Department to submit any authorities he had on the subject. Counsel filed a supplemental memorandum. Its central argument was that continuing jurisdiction of the juvenile court depended on the child's being "at risk." Counsel wrote, "[J.S.] no longer requires the Court's supervision because he is not at risk in the care of his father. [J.S.] no longer falls within the provisions of Section 300. Consequently the matter should be dismissed with juvenile court custody orders." Counsel noted that future visitation and custody concerns could most appropriately be litigated in family court.

---

[3] "MR. HAMMON: . . . And for those reasons, Your Honor, I think it is appropriate to dismiss this case.

"THE COURT: All right. Being that we're not going to agree, I can't deny you to continue to present your case."

[4] The transcript contains numerous instances of garbled sentences or, perhaps, dropped words.

At the resumed hearing, the court announced its intention to adopt the Department's recommended disposition, i.e., custody in Thomas, with visitation reserved to R.S., and termination of juvenile court jurisdiction. After reiterating its earlier findings that the evidence justified J.S.'s removal from his mother's care, the court said, "The issue that was left for the court to decide was whether the court was required to keep the dependency open in order to have the non-custodial parent in this case[, R.S.,] for there to be conditions to the visitation order which custody order has been provided." At this point counsel for R.S. interjected an observation that triggered a long discussion of the exact terms and conditions of visitation now being recommended by the Department. When this had seemingly been settled, the court reiterated that it was adopting the Department's recommendations, including that "I will be terminating jurisdiction over this family and dismissing the dependency." The court then reiterated its concern that the parents both receive a class or counseling to facilitate improved communications between them. R.S. had already been ordered into such a class, along with J.C.'s father, and counsel for Thomas said that his joining in the class "could be part of [his] voluntary services." Discussion of this point ultimately led to the suggestion that the parents' participation in the class be made a condition of the mother's visitation rights. Counsel for the Department pointed out, however, that this could make R.S.'s visitation rights contingent upon Thomas's compliance with the condition—which, R.S.'s counsel interjected, "is exactly why I think the case should stay open, Your Honor." The court observed, however, that Thomas "is the non-offending parent" and "has agreed, has represented to the court that he would be participating in voluntary services and that would be made part of it." The court also agreed, at the urging of counsel for R.S., to order sibling visitation between J.S. and J.C.

On November 10, 2010, the court signed a "Custody Order Juvenile—Final Judgment" adopting the foregoing provisions. R.S. filed a timely notice of appeal.

## DISCUSSION

### I. *Failure to Make Required Finding*

It is undisputed that R.S.—the parent originally having custody of J.S.—demonstrated a present inability to adequately protect and care for him. It is also undisputed that Thomas—originally the "non-custodial parent"—had the ability, inclination, and wherewithal to provide a suitable home. The present dispute is not concerned with the juvenile court's power to place the child in

Thomas's custody; the propriety of its doing so is not questioned. The question is whether it properly divested itself of jurisdiction after doing so, without making a finding explicitly supporting that action. More precisely, the question is whether its failure to make such a finding warrants reversal for further proceedings.

At the heart of this matter is section 361.2, which governs the placement of a child who is removed from the home of one parent and placed with the other parent.[5] Of particular concern here is the requirement in section 361.2(b) that when the court enters such an order it "make a finding either in writing or on the record of the basis for its determination under subdivision[] . . . (b)." That subdivision specifies three alternatives among which the court may choose. The option the court ultimately selected here is the first one listed in the statute: to grant legal and physical custody to the noncustodial parent and terminate its own jurisdiction, while providing reasonable visitation rights to the former custodial parent. (§ 361.2, subd. (b)(1).) This approach contemplates that any further proceedings will take place in the family court. (*Ibid.*; see § 362.4.) The chief alternative, toward which the

---

[5] Section 361.2 provides in pertinent part: "(a) When a court orders removal of a child pursuant to Section 361, the court shall first determine whether there is a parent of the child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300, who desires to assume custody of the child. If that parent requests custody, the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child.

"(b) If the court places the child with that parent it may do any of the following:

"(1) Order that the parent become legal and physical custodian of the child. The court may also provide reasonable visitation by the noncustodial parent. The court shall then terminate its jurisdiction over the child. The custody order shall continue unless modified by a subsequent order of the superior court. The order of the juvenile court shall be filed in any domestic relation proceeding between the parents.

"(2) Order that the parent assume custody subject to the jurisdiction of the juvenile court and require that a home visit be conducted within three months. In determining whether to take the action described in this paragraph, the court shall consider any concerns that have been raised by the child's current caregiver regarding the parent. After the social worker conducts the home visit and files his or her report with the court, the court may then take the action described in paragraph (1), (3), or this paragraph. However, nothing in this paragraph shall be interpreted to imply that the court is required to take the action described in this paragraph as a prerequisite to the court taking the action described in either paragraph (1) or paragraph (3).

"(3) Order that the parent assume custody subject to the supervision of the juvenile court. In that case the court may order that reunification services be provided to the parent or guardian from whom the child is being removed, or the court may order that services be provided solely to the parent who is assuming physical custody in order to allow that parent to retain later custody without court supervision, or that services be provided to both parents, in which case the court shall determine, at review hearings held pursuant to Section 366, which parent, if either, shall have custody of the child.

"(c) The court shall make a finding either in writing or on the record of the basis for its determination under subdivisions (a) and (b)."

court below was originally inclined, is to retain jurisdiction while ordering the noncustodial parent to assume custody pending the provision of reunification services to the previous custodial parent, the new custodial parent, or both. (§ 361.2, subd. (b)(3).) The third option is, in effect, to postpone a choice between the other two pending a home visit to determine the suitability of the former noncustodial parent's home, with particular attention to any concerns expressed by the previous caregiver. (§ 361.2, subd. (b)(2).) As the court here recognized, this option was not really available because a home visit had already been conducted.

Although the court made clear which option it was choosing, it failed to make any formal finding directed to this choice. In this regard it failed to comply with the statutory requirement of "a finding either in writing or on the record of the basis for its determination." (§ 361.2(c).) This omission forms the basis for R.S.'s chief argument on appeal.

■ An express finding on a contested issue—or a statement of reasons for a judicial decision—can shape and improve the adjudicatory process through either or both or two mechanisms. First, it can directly influence the trial court's *actual reasoning process* by compelling it to consciously consider and resolve specified issues. Second, it can *enhance appellate review* of the trial court's reasoning by making that reasoning explicit and reducing, if not eliminating, the role of inference on appeal. Ordinarily, of course, appellate courts will indulge all reasonable inferences favorable to the judgment. But this familiar doctrine becomes potentially subversive where the Legislature requires the trial court to make an express finding. Such a requirement may be deprived of all force if appellate courts feel free to infer a supporting finding where the trial court has left the record silent. For that reason the doctrine of implied findings may be given limited scope where an express finding is required. (See *In re V.F.* (2007) 157 Cal.App.4th 962, 973 [69 Cal.Rptr.3d 159]; *In re Marquis D.* (1995) 38 Cal.App.4th 1813, 1824–1826 [46 Cal.Rptr.2d 198].)

■ The same cannot be said, however, of another familiar barrier to appellate reversal: the rule of harmless error. Before any judgment can be reversed for ordinary error, it must appear that the error complained of "has resulted in a miscarriage of justice." (Cal. Const., art. VI, § 13.) Reversal is justified "only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]; see 6 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Reversible

Error, § 7, p. 450.) A reasonable probability for these purposes does not mean an *absolute* probability; the likelihood that the error affected the outcome need not be greater than the likelihood that it did not. (*College Hospital Inc. v. Superior Court* (1994) 8 Cal.4th 704, 715 [34 Cal.Rptr.2d 898, 882 P.2d 894].) The test is satisfied, and prejudice appears, if the case presents "an equal balance of reasonable probabilities." (*People v. Watson, supra,* 46 Cal.2d at p. 837.)

 Here we can see no reasonable probability that had the trial court complied with the statutory requirement, it would have answered differently the question whether to terminate its jurisdiction in this matter. The court addressed itself assiduously to that question, which was the predominant subject of hearings over portions of three days. The court was originally inclined to retain jurisdiction on general principles, then as a method of supervising visitation and the improvement of communications between the parents. Ultimately, however, it was manifestly persuaded that its concerns would be adequately addressed, without retaining jurisdiction, by the Department's continued involvement with both parents and the availability of family law court to resolve any otherwise insoluble conflicts that might arise.

While the court undoubtedly possessed the discretion to retain jurisdiction it was never presented with a solid reason to do so. Ultimately the only concrete reasons suggested to the court were that (1) Thomas might renege on his voluntary submission to services, and (2) in the event of a resort to family court, neither parent would be represented by counsel. These points were placed squarely before the court, it was manifestly unpersuaded by them in the end, and there is no reason to believe that it would have found them any more persuasive if it had performed its statutory obligation to make an express finding in support of the termination of jurisdiction.

R.S. asserts that the failure to make an express finding in support of the termination of jurisdiction constitutes reversible error without regard to prejudice. Her argument is not easily pinned down, but includes the following assertions: (1) A decision to terminate jurisdiction is generally reviewable under an abuse-of-discretion standard; (2) a trial court abuses its discretion by failing to apply the governing legal principles and policies; (3) the trial court failed to comply with statutory requirements by making the requisite finding; (4) the court failed to exercise an informed discretion by considering the possibility that services could enable R.S. to reunify with J.S.; and (5) the court acted in excess of jurisdiction because its power to terminate jurisdiction was conditioned on making the required express finding.

Several of these points conflate the question of *error* with the question of *reversibility*. It is true that a failure to exercise discretion may be reversible without a showing that its exercise would, in reasonable probability, produce a more favorable result. But the point is academic, because there is no basis to suppose that the court here failed to exercise its discretion. It manifestly did exercise it. Specifically, it concluded—after a great deal of colloquy and, we presume, cogitation—that there was insufficient reason to retain jurisdiction. R.S.'s attempts to bootstrap the absence of a supporting *finding* into a complete failure to exercise the substantive discretion vested by law are manifestly unsound.

Nor does the record suggest any basis for the suggestion that the court's terminating jurisdiction without the required finding constituted an act exceeding the court's jurisdiction. R.S. asserts that premise en route to the suggestion that the order under review is "void" and "must be annulled." But the cases cited by her have no apparent bearing on this case. In *Abelleira v. District Court of Appeal* (1941) 17 Cal.2d 280, 291 [109 P.2d 942], the court was concerned with the meaning of the phrase "[l]ack of jurisdiction" in the context of "determining the right to review by *certiorari*, restraint by prohibition, or dismissal of an action." (*Id.* at p. 288.) That case might be germane if R.S. were seeking an extraordinary writ to prevent the trial court from entering an order without the required finding. But we are concerned with an error charged on direct appeal after the trial court has entered its final judgment.

Nor can we discern any relevant legal principle in *In re Andres G.* (1998) 64 Cal.App.4th 476, 482 [75 Cal.Rptr.2d 285], where the court discussed the concepts of acts " 'beyond a court's jurisdiction in the fundamental sense' " and those " 'in excess of jurisdiction.' " R.S. makes no attempt to establish, and we see no reason to conclude, that the failure to make the required finding here placed the order outside the court's jurisdiction in either sense. The implied argument to the contrary would logically extend to *all* errors, rendering the trial court's action "void" or "voidable" whenever it fails to conform perfectly to the requirements of law. This would obliterate the concept of harmless error not only in this case, but in all cases. The other decisions cited by R.S. on this subject appear equally inapposite. (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 453, 462 [20 Cal.Rptr. 321, 369 P.2d 937] [act was in excess of jurisdiction for purposes of certiorari]; *Moffat v. Moffat* (1980) 27 Cal.3d 645, 654–655 [165 Cal.Rptr. 877, 612 P.2d 967] [order in excess of jurisdiction but not beyond issuing court's fundamental power was invulnerable to collateral attack when raised as res judicata].)

R.S. also argues that the error was prejudicial. She asserts that prejudice appears from the court's initial view that ongoing supervision was warranted.

But this shows only that the court changed its mind, not that its decision was the product, in whole or part, of its failure to make the required finding. It is indeed a matter of appellate concern when a trial court seems to adopt a settled view of a case and then, without explanation, enters a judgment contrary to that view—particularly when the record seems to strongly support the original view, while providing only doubtful grounds for the judgment as entered. But this is not a case where the court inexplicably reversed itself after stating a definite view. The court changed its mind after a great deal of colloquy and the Department's forceful written argument that there was no basis for continued jurisdiction because J.S. was no longer "at risk" and all other concerns were adequately addressed by other mechanisms. This argument echoes the legislative declaration that the purpose of the dependency statutes "is to provide maximum safety and protection for children who are currently being physically, sexually, or emotionally abused, being neglected, or being exploited, and to ensure the safety, protection, and physical and emotional well-being of children who are at risk of that harm." (§ 300.2; see *In re Robert L.* (1998) 68 Cal.App.4th 789, 794 [80 Cal.Rptr.2d 578] [juvenile court jurisdiction "must be based upon existing and reasonably foreseeable future harm to the welfare of the child"].)

It is true that the law reflects great solicitude, as it must, for the fundamental rights of parents in their relationship with their children. Thus, where the choice is between return to a parent and permanent placement with someone else, great efforts should be and are taken to bring about the former disposition. In the present case, however, two parents—mother and father—stood before the court. The father could immediately provide a safe and nurturing home; the mother could not. The mother's claim to the assistance of the state in correcting the deficiencies that gave rise to the dependency would be addressed in a parallel proceeding involving another dependent child. The father showed every sign of cooperating freely in maintaining the child's relationship with the mother. The Department stood ready to supply whatever services it found necessary or desirable to serve the child's best interests. The family court stood with open doors to address any insoluble disputes over custody or visitation. Conceivably, the juvenile court itself could reassert jurisdiction upon a proper motion and showing. (See *In re D.R.* (2007) 155 Cal.App.4th 480 [66 Cal.Rptr.3d 151].) Given these facts there is no mystery in the court's ultimate decision that its jurisdiction in the matter should end. The mystery, if any, was in its original hesitancy to reach that conclusion. Having reviewed the record with some care, we are satisfied that the court was merely exhibiting a commendable caution and circumspection before reaching what seems an entirely reasonable, if not inevitable, result. We see no basis to suppose that requiring it to express its reasons would have led it to revert to its earlier, deliberately abandoned view.

## II. *Abuse of Discretion*

As distinct from her charge of *procedural* error in failing to make a required finding, R.S. contends that the trial court committed *substantive* error—abused its discretion—by terminating its jurisdiction. According to her, the court applied an "incorrect legal standard" to this question by adopting, as it inferentially did, the Department's argument that jurisdiction should terminate because J.S. was no longer "at risk." R.S.'s reasoning on this point proceeds more or less as follows: (1) Section 361.2 requires a "two-step analysis" under which the court must first decide whether placement with the formerly noncustodial parent would be detrimental to the child, and then determine whether there is a continuing need for supervision so as to justify the ongoing exercise of jurisdiction; (2) by arguing only that J.S. was no longer "at risk," the Department addressed only the first step, while ignoring the second; (3) insofar as the trial court was persuaded by this argument, it applied an incorrect legal standard, i.e., it failed to consider whether further supervision was warranted.

Our discussion of the procedural error anticipates our response to this argument. The Department's assertion that J.S. was no longer "at risk" was an invocation not of section 361.2 but of section 300.2, which states that the purpose of the dependency statutes "is to provide maximum safety and protection for children who are currently being physically, sexually, or emotionally abused, being neglected, or being exploited, and to ensure the safety, protection, and physical and emotional well-being of children who are at risk of that harm." It is true that the risk of harm is not the *sole* concern in a dependency proceeding; the Legislature also recognized that the child's "safety, protection, and physical and emotional well-being" may be served by the "provision of a full array of social and health services to help the child and family and to prevent reabuse of children." (*Ibid.*) It goes on to state that "[t]he focus shall be on the preservation of the family as well as the safety, protection, and physical and emotional well-being of the child." (*Ibid.*) This undoubtedly entitled R.S. to assistance in preserving her relationship with J.S. But much of that assistance would be offered to her in the parallel proceeding involving her daughter. Insofar as Thomas's cooperation was required, he had promised in all apparent sincerity to cooperate. In any event, once J.S. was placed with his father and was found not to be "at risk" in that setting for any of the enumerated harms, the core predicate for juvenile court jurisdiction disappeared. As we have already noted, there was nothing before the court indicating that the relatively heavy hand of the juvenile court law was needed to secure needed services or the development of J.S.'s relations with both of his parents as well as his sister. The trial court did not abuse its discretion in terminating its jurisdiction over this child.

## DISPOSITION

The order under review is affirmed.

Premo, J., and Elia, J., concurred.