Filed 8/5/24  In re N.Z. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re N.Z., a Person Coming Under the Juvenile Court Law. | B330384 (Los Angeles County Super. Ct. No. 23CCJP00368A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>       Plaintiff and Respondent,<br><br>       v.<br><br>A.M.,<br><br>       Defendant and Appellant;<br><br>B.Z.,<br><br>       Defendant and Respondent. | |

APPEAL from orders of the Superior Court of Los Angeles County.  Daniel Zeke Zeidler, Judge.  Affirmed.

Janelle B. Price, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Melania Vartanian, Deputy County Counsel, for Plaintiff and Respondent.

Megan Turkat Schirn, under appointment by the Court of Appeal, for Defendant and Respondent.

Lelah S. Forrey-Baker, under appointment by the Court of Appeal, for Minor.

_____

At the disposition hearing below, the juvenile court placed four-year-old N.Z. (son) with his previously noncustodial father B.Z. (father), entered a final custody order, and terminated dependency jurisdiction.  On appeal, son's mother, A.M. (mother), challenges the juvenile court's order terminating jurisdiction.  For several reasons, mother argues the juvenile court should have continued its jurisdiction over son after being placed with father, who lives in Alaska.  Mother also claims the court committed prejudicial error when it failed to make express findings regarding its order terminating jurisdiction.

We find no reversible error and affirm.

## BACKGROUND

### 1.    The Family

Mother and father met when father was 17 years old and mother was 19 years old.  They dated for nine or ten years.  While together, both used drugs.  Son was born in early 2019 and is their only child together.

2

For a few years, mother and father lived with father's parents (paternal grandparents). Paternal grandmother described mother and father's relationship as "toxic" and said mother stole from her. On one occasion, before son was born, mother and father engaged in "an intense argument," both slapped and shoved the other, and father pushed mother out of a car. Both mother and father filed police reports. Father was convicted of domestic battery. At some point after son was born, mother and father lived with a paternal aunt, who believed mother was using marijuana.

Father ended his relationship with mother in 2020, when son was about two years old. According to father, he ended the relationship because "mother did not want to stop using meth" and "he did not like the road mother had him going down." Around the same time, father's family business failed and mother began taking son to Mexico for extended periods of time to visit her father (maternal grandfather). Father became depressed and, for approximately one year after the break-up, he abused alcohol and cocaine to "cope." Eventually, in March 2022, father moved to Alaska for work and "to get away from the negative influences around him." He saw son in person when he was home and if mother made son available. Paternal relatives visited son when mother allowed.

After breaking up with father, mother and son moved in with mother's mother (maternal grandmother). Maternal grandmother was son's primary caregiver. Mother said there is no family law order pertaining to son and father never has provided financial assistance for son.

## 2.    Events Preceding Petition

In December 2022, mother gave birth to her second child, a girl.  At the time, both mother and her newborn daughter tested positive for TCH and methamphetamine.  The Department was notified, and a Department social worker arrived to speak with mother at the hospital.  Mother told the social worker she had been raped in Mexico by an uncle, which resulted in her becoming pregnant.  While at the hospital, mother arranged for her daughter to be adopted.[1]  Mother denied using methamphetamine while pregnant but admitted she smoked marijuana during her pregnancy.  She said she did not know she was pregnant until one month before she gave birth.  Mother told the social worker she was homeless and had been "couch surfing," staying with her sister and friends.  Mother also said maternal grandmother lived in Mexico, as did most of her maternal relatives.  Mother denied having any other children or pregnancies.  When asked about son, mother said she did not know who son was.

The same day, the Department social worker also spoke with maternal grandmother, who (contrary to what mother had said) lived in Los Angeles with two of her brothers.  Maternal grandmother told the social worker mother had given her verbal permission to be son's guardian, maternal grandmother provided son's basic care and necessities, son primarily lived with her and looked to her as his caregiver.  Maternal grandmother said mother "comes and goes."  Maternal grandmother last saw mother two weeks earlier.  She did not know where mother was when she was not at the home.  Maternal grandmother said

---

[1] The adoption was finalized soon after daughter's birth.

father was not involved in son's life.  The social worker asked maternal grandmother to encourage mother to call the social worker, which maternal grandmother agreed to do.

One month later, in early January 2023, the social worker again spoke with maternal grandmother at her home.  Maternal grandmother reported mother left for Mexico two weeks earlier to visit maternal grandfather, who was sick.  Mother took son with her to Mexico.  Maternal grandmother did not know when they would return and was unable to contact them.  Maternal grandmother was not worried about son and said mother was a good mother.  A few days later, maternal grandmother told the social worker mother planned to stay in Mexico with son until the summer, at least.

On several occasions, the social worker asked maternal grandmother to tell mother to call the social worker.  Maternal grandmother repeatedly said she gave mother the message to call, and mother said she would call.  Nonetheless, mother had not contacted the social worker.

In late January 2023, the social worker spoke with father, who lived in Alaska.  Father told the social worker he moved to Alaska almost one year earlier, in March 2022, for work.  He had a stable job, housing, and a girlfriend, who was employed and had three children of her own.  Before Alaska, father was living with paternal grandparents in Los Angeles and, when mother and son were not visiting maternal grandfather in Mexico, he saw son consistently.  Father indicated he had a good relationship with son.  Father and mother had informally agreed that, after father moved to Alaska, son would continue to visit with paternal grandparents.

It had been approximately five months since father last saw son in person.  Father visited son in August 2022 in Los Angeles.  At that time, according to father, "mother 'did not look good' " and appeared to be on drugs.  Father said, "mother's drug of choice is crystal meth."  Father also communicated with son through FaceTime in October 2022, at which time paternal grandparents reported mother did not look well and appeared to be pregnant.  Father also had heard from some of mother's friends who believed mother was using drugs.  In early 2023, father was in Los Angeles and tried unsuccessfully to visit son at maternal grandmother's home.  It does not appear father knew mother recently had given birth to her daughter, then left with son for Mexico.

Father told the social worker he drank alcohol occasionally but did not "use any substances."  He had a history of minor legal infractions and was arrested for the domestic violence incident with mother before son was born.  He said he completed his classes and community service related to that arrest and has no other history of or current issues with domestic violence.

Father wanted son placed with him.  He said he had been planning to seek custody of son before the Department became involved.  If, however, the Department did not want son to relocate to Alaska, son could stay with paternal grandparents and father would visit and send money to support son.  Father recently had been served with child support documents.

The social worker also spoke with paternal grandparents, who reported having frequent contact with son prior to mother taking him to Mexico.  Paternal grandfather stated son liked to visit them.

### 3.  Petition

On January 31, 2023, the Department filed a two-count Welfare and Institutions Code section 300 petition on behalf of son (petition).[2]  The petition alleged mother's history and current use of methamphetamine and marijuana put son at risk, father knew of mother's substance abuse but failed to protect son, and father's history of substance abuse put son at risk.

At the detention hearing held the next day, the juvenile court ordered son (who presumably still was in Mexico) detained from mother and released to father over the Department's objection.  The court ordered father either to reside in California or to arrange for son to stay with paternal grandparents.  The court also required father to submit to drug testing and the Department to conduct unannounced home visits.  The juvenile court granted the Department's request for a protective custody warrant for son and an arrest warrant for mother.

### 4.  Further Investigation; Mother and Son's Return

In February 2023, the Department reported mother had called a Department social worker the same day the petition was filed.  In that phone call, mother told the social worker she was not trying to hide from the social worker but was caring for maternal grandfather in Mexico.  Son was with her and was fine.  Mother confirmed maternal grandmother "had been telling her" to call the social worker.  Mother did not have a telephone and was using maternal grandfather's phone to make the call.  Initially, mother denied saying (when at the hospital after giving birth to her daughter) she did not know who son was.  Eventually, however, mother explained she denied knowing son

---

[2] Undesignated statutory references are to the Welfare and Institutions Code.

"because she did not want [son] to be involved because he had nothing to do with the situation." The social worker told mother a dependency case had been opened and encouraged mother to return home with son so he could be assessed. Mother said she understood and would return home within the next couple of weeks, after maternal grandfather had a scheduled surgery and was well enough for her to leave. Mother did not return home with son in the next couple of weeks and did not maintain contact with the Department.

Also in February 2023, a Department social worker spoke with father by telephone. He stated his goal had been to raise son and coparent with mother, but mother made that difficult. Father admitted that, approximately two years earlier, he had abused substances such as cocaine and alcohol. Father became depressed after his business failed and mother moved with son to Mexico. He said son was not in his care while under the influence and, since moving to Alaska, he was "sober." Father agreed to submit to drug testing. In February 2023, father tested negative for all substances.

Father told the social worker that after mother's friends told him mother appeared to be using drugs, he asked paternal grandparents to check on son. Father was willing and able to care for son and maintained consistent contact with the Department. Father's girlfriend also spoke with the social worker. She had three children, ages 15, 11, and 7, and no history of dependency cases or investigations involving her children. The Department contacted a protective services specialist in Alaska to inquire about a "courtesy home assessment."

A Department social worker also spoke with paternal grandparents and a paternal aunt. Paternal grandparents were able and willing to care for son. Paternal grandmother stated mother did not allow paternal relatives to have regular contact with son. Paternal grandmother believed son was attached to mother. According to paternal grandmother, father was doing very well in Alaska and his girlfriend was responsible and caring. Paternal grandfather and the paternal aunt both stated paternal relatives consistently sought contact with son, but mother was not always available.

By March 2023, the Department had approved paternal grandparents' home in Los Angeles and recommended an expedited home assessment or courtesy home visit for father's home in Alaska. The Department recommended, if son was located, that he be placed with paternal grandparents until father's home in Alaska could be assessed. If father's home was determined to be safe, son could be placed with father in Alaska.

In late April, mother (who was still in Mexico) again contacted a Department social worker. The social worker again advised mother of the pending dependency case and that it was important mother return home with son. Mother stated she planned to return home within one to two weeks.

On May 7, 2023, mother and son returned home. In light of the protective custody and arrest warrants, mother and son were taken to a sheriff's department station, where they were met by a Department social worker. The responding sheriff's deputy reported "mother was very cooperative and [son] appeared to be healthy and well nourished." Mother noted she had told the Department she was in Mexico caring for maternal grandfather. She did not know she had done anything wrong and was willing

9

to cooperate with the Department. The social worker also reported son "appeared healthy and well nourished." Son was placed with paternal grandparents. Father arrived in Los Angeles two days later and was willing to stay "as long as needed."

At a hearing held a few days later, mother made her first appearance in the case and requested that son be released to her and to father. She also requested that son not be allowed to relocate to Alaska, "as this would present a near insurmountable hardship on visitation and reunification." Counsel for son noted son was "extremely bonded to his mother and would like to reside with her," however, at that time, counsel could not recommend release to mother. At the hearing, the juvenile court ordered mother and father to stay away from each other and mother to stay away from paternal relatives. The court also ordered the Department to facilitate visits with son for mother and maternal relatives as often as possible and, if son moved to Alaska, to facilitate frequent remote contact for mother with son. At the hearing, the juvenile court recalled both the protective custody warrant and arrest warrant.

In a June 2023 report, the Department stated father and son were residing temporarily with paternal grandparents. The Department reported son was shy with Department social workers but appeared comfortable with father and paternal grandparents. Son had medical and dental appointments that month. He had five cavities and required a "small root canal."

Department social workers spoke with father, who indicated he wanted to return to Alaska with son but would remain in Los Angeles to ensure son was comfortable with him and paternal grandparents as well as to "see what will happen

with court." He did not want to leave without son. Father said he wanted the dependency case to remain open as long as he was in Los Angeles and appreciated the support he was receiving with respect to monitored visits for mother. Father expressed concern that mother might make allegations against him. On May 12, 2023, father again tested negative for substances.

A Department social worker also spoke with mother. The social worker stated mother was "emotional," "cooperative, coherent, receptive during the interview and did not appear to be under the influence of drugs or alcohol." Mother was worried about son, stating, "I know he misses me. I know he's sad." She said this was the first time son was in father's care. However, she was not concerned for son's safety because paternal grandparents were helping. Mother did not want son to live in Alaska. She denied restricting paternal grandparents' ability to see son. Mother said she had been staying with her brother in Los Angeles but needed to leave that home in two days.

Mother believed she was a good mother to son, always took care of him, and never neglected him. She wanted son returned to her care and stated, "No more drug mistakes." Mother reported she started using marijuana when she was 16 years old and methamphetamine when she was 21 years old. Mother said she last used marijuana in April 2023 (i.e., during the most recent time she was in Mexico with son) and methamphetamine in December 2022. She used both drugs while pregnant with her daughter. Mother said she and father both used drugs when they were together but not at the same time and they would deny their drug use to each other, which " 'caused problems.' " According to mother, father used methamphetamine and cocaine. She said a paternal aunt told her father "was sent to live in

11

Alaska due to his ongoing substance abuse issues." She said father knew of her drug use. During May and June 2023, mother twice tested positive for marijuana, failed to show for one test, and tested negative once. By June 2023, mother had enrolled in an inpatient program and agreed to participate in the Department's "Drug Court program."

Mother had monitored visits with son several times a week for two hours. A Department social worker reported that, at a June 2023 visit, son refused to get out of the car to see mother. Eventually, however, son participated in the visit. According to father, son said he did not want to visit with mother.

Maternal grandmother stated mother and son " 'have a good bond' " and son was " 'attached to' " mother. Maternal grandmother continued to deny mother had substance abuse issues. She believed father had a temper and was worried paternal relatives might "brainwash" son.

The Department noted mother had "been using substances for approximately 14 years." The Department believed mother would benefit from individual therapy and a substance abuse program. Although mother recently had enrolled in a substance abuse program, it was too early to consider releasing son back to her care. As to father, the Department stated "there is no indication of any recent use of substances" and he had tested negative twice, with another test pending. Based on father's past use of substances, the Department believed he should participate in random drug testing. The Department did not see a need for domestic violence counseling despite his earlier altercation with mother, but recommended parenting education. The Department recommended son be placed with father under Department supervision.

## 5. Adjudication, Disposition, and Termination of Jurisdiction

On June 29, 2023, approximately two months after mother and son returned from Mexico, the juvenile court held a combined adjudication and disposition hearing. At the start of the hearing, the juvenile court stated it "was leaning towards" conducting the adjudication and, assuming the court sustained the petition, allowing father and son to go to Alaska. Then, at a later-held disposition hearing, the court would consider closing the case with a custody order. After the court so advised the parties, counsel for father and for the Department confirmed the Department already had authorized father to move to Alaska with son.

After hearing argument, the court dismissed the allegations of the petition against father and found father was nonoffending. The court sustained the allegations against mother and declared son a dependent of the court under subdivision (b) of section 300.

Despite what it had contemplated at the start of the hearing, and without objection, the court then moved directly to disposition. Counsel for father argued further court supervision was not necessary because son was safe with father. Father's counsel asked the court to terminate its jurisdiction, noting mother could "continue to make progress and work to regain custody without court supervision." Son's attorney joined father's request for termination of jurisdiction and entry of a custody order. Counsel believed son was safe with father and court supervision was not necessary. Counsel for son also argued father should have sole legal custody. Counsel stated father and

13

mother had difficulty coparenting and mother denied father contact with son when she took him to Mexico for months.

On the other hand, counsel for mother objected to an order terminating jurisdiction and closing the case. Mother's counsel requested a home of parents order or, in the alternative, unmonitored visits for mother at her inpatient program. Mother's counsel reminded the court mother had been the previous custodial parent and she denied "abscond[ing] with [son] to Mexico." Counsel for mother also argued father's drug use, awareness of mother's drug use, and domestic violence outburst were "not so distant." Mother believed the case should be kept open not only to ensure son's safety but to allow her an opportunity to reunite with son. However, if the court terminated its jurisdiction over mother's objection, mother's counsel requested mother be granted joint legal custody of son and at least six hours of weekly visitation. Mother's counsel did not otherwise address visitation.

Counsel for the Department also argued the juvenile court should keep the case open. Recognizing the length of time mother had cared for son, the Department asked the court to grant services for mother to give her an opportunity to reunify with son, which the Department believed was in son's best interest. The Department also noted father previously had asked for the case to remain open so he could receive support from the Department. Finally, if the court chose to terminate jurisdiction over the Department's objection, the Department did not object to the proposed custody order.

After hearing argument, the juvenile court removed son from mother's custody and care and placed him with father. Over the objections of the Department and mother, the court

14

terminated jurisdiction with a custody order granting father sole legal and sole physical custody of son. The court granted mother monitored visits or contact with son for a minimum of six hours each week. The court also ordered mother and father to communicate exclusively through "Talking Parents or another app." The court explained it required monitored visits because mother had not made substantial progress in or completed a substance abuse treatment program, domestic violence for victims program, individual counseling, or a 12-step program. Finally, the court noted the custody order would be filed in the family law court, where parents could seek modifications of the order.

The juvenile court signed and entered the final custody order that same day.

Mother appealed.

## DISCUSSION

### 1. Termination of Dependency Jurisdiction

Mother argues the juvenile court erred when, after placing son with father, it terminated dependency jurisdiction. Mother claims, rather than terminate jurisdiction, the juvenile court should have maintained jurisdiction for a minimum of six months while the parents engaged in services under Department supervision.[3] Although mother's preferred outcome was one option the juvenile court could have chosen under the applicable statutory scheme, we conclude the juvenile court did not abuse its

---

[3] Mother does not challenge the juvenile court's order placing son with father. Thus, although briefed by the Department, we do not address that issue.

15

discretion when it chose a different option under the same scheme.

### a.  Applicable Law

Section 361.2 is applicable here.[4]  Subdivision (a) of that section provides:  "If a court orders removal of a child pursuant to Section 361, the court shall first determine whether there is a parent of the child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300, who desires to assume custody of the child.  If that parent requests custody, the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child." (§ 361.2, subd. (a).)

After placing son with father under subdivision (a) of section 361.2, subdivision (b) of that same section gave the court the following three options:  "(1) Order that [father] become legal and physical custodian of the child.  The court may also provide reasonable visitation by [mother].  The court shall then terminate its jurisdiction over the child.  The custody order shall continue unless modified by a subsequent order of the superior court.  The order of the juvenile court shall be filed in any domestic relation proceeding between the parents.  [¶]  (2) Order that [father] assume custody subject to the jurisdiction of the juvenile court and require that a home visit be conducted within three months. . . .  [¶]  (3) Order that [father] assume custody subject to the supervision of the juvenile court.  In that case the court may

---

[4] On appeal, father cites to section 364.  However, that section is inapplicable here, where the juvenile court placed son with father, a previously noncustodial parent.

16

order that reunification services be provided to [mother], or the court may order that services be provided solely to [father] in order to allow [father] to retain later custody without court supervision, or that services be provided to both parents, in which case the court shall determine, at review hearings held pursuant to Section 366, which parent, if either, shall have custody of the child."  (§ 361.2, subd. (b) (subdivision (b)).)

Thus, subdivision (b) "vests the court with the discretion either to deny or offer reunification services when the children are placed in the physical custody of the formerly noncustodial parent."  (*In re Nada R.* (2001) 89 Cal.App.4th 1166, 1179.)  "The question is whether juvenile court services and ongoing supervision were necessary to protect the child from harm."  (*In re D.B.* (2020) 48 Cal.App.5th 613, 624; see also *In re Destiny D.* (2017) 15 Cal.App.5th 197, 211 ["Jurisdiction should not be terminated unless the court concludes services and ongoing supervision are not necessary to protect the child."].)  Of course, underlying this is the "fundamental premise of dependency law," which is "to serve the best interests of the dependent child."  (*In re Samuel G.* (2009) 174 Cal.App.4th 502, 510.)

b.    **Standard of Review**

We apply the abuse of discretion standard of review to the juvenile court's decision to place son with father and terminate jurisdiction.  (*In re K.B.* (2015) 239 Cal.App.4th 972, 981; *In re Nada R.*, *supra*, 89 Cal.App.4th at p. 1179.)  Under this standard of review, we will not reverse the juvenile court's determination " ' "unless the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination." ' "  (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318.) " 'The appropriate test for abuse of discretion is whether the trial

17

court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.'" (*Id.* at pp. 318–319.)

### c. No Abuse of Discretion

After placing son with father (the previously noncustodial parent) under section 361.2, subdivision (a), the juvenile court chose to proceed under the first option afforded by subdivision (b). In other words, the court chose not to offer reunification services but, instead, granted father sole legal and physical custody of son, provided visitation for mother, and terminated its jurisdiction over son. (§ 361.2, subd. (b)(1).)

Mother does not and did not object to son's placement with father. Indeed, no one objected to son's placement with father. Rather, mother argues the juvenile court erred in terminating its jurisdiction over son. For several reasons, mother claims it was in son's best interest—both for his safety and to provide an opportunity to reunify with mother—to keep the case open and continue the court's supervision under either of the other two options afforded by subdivision (b).

First, mother claims the juvenile court improperly failed to evaluate either father's need for services or the appropriateness of father's home. Mother points to father's previous arrest for domestic violence, father's history of substance abuse, and the lack of any assessment of father's home in Alaska. Initially, we note father was nonoffending and there was no objection to son's placement with him while the case was pending. We also note the record is devoid of evidence that father was ever inappropriate or unsafe with son. There is no evidence father had ongoing domestic violence issues with mother and no

18

indication father had domestic violence issues with anyone else. Since being alerted to the proceedings below, father was responsive, cooperative, and testing negative. Additionally, the Department not only recommended placing son with father but also, by the time of the June 2023 adjudication and disposition hearing, had authorized father to move with son to Alaska. Also, although mother implies father had not been a custodial parent of son, he and mother both raised son until son was about one and a half years old. Although the juvenile court certainly could have ordered services and an assessment of father's home in Alaska, on this record, it was not an abuse of the court's discretion not to do so.

Second, mother claims the juvenile court abused its discretion when it denied her the opportunity to participate in services and, therefore, also the potential to reunify with son. Mother notes she was son's custodial parent, shared a bond with son, had begun drug testing, recently had entered an inpatient treatment program, and agreed to participate in "Drug Court." Certainly, the juvenile court could have opted to keep the case open and provide mother with services, which might have improved her relationship with son and her odds of reunifying with him, but the court was not required to do so. Given the facts of this case, we see no abuse of discretion in the court's decision not to accommodate mother's request. Son was comfortable with father. Father was ready and willing to care for son. Although mother tried to minimize it, her history of substance abuse was longstanding and, only recently, had she begun to address it. Mother had, and still has, avenues available to her not only to continue addressing the issues that brought son before the court, but also eventually to seek modification of the custody order. As

19

the case has now moved into family court, mother can petition that court to modify the custody order.  (§§ 302, subd. (d), 362.4.)

Finally, mother claims the juvenile court's visitation order is arbitrary and capricious, and not in son's best interests.  Given father and son's out of state location, the apparent discord between the parents, and the lack of detail in the order, mother believes the "visitation order is virtually unworkable."  Mother worries father might not accommodate her visitation requests, including choosing a monitor or method of visitation.   Although it seems mother and father could improve communication with each other, the record does not indicate father did or would go out of his way to impede mother's relationship with son.  If, however, father obstructs mother's visitation with son, mother can seek enforcement or request modification of the order in family court. (§§ 302, subd. (d), 362.4; *In re D.B.*, *supra*, 48 Cal.App.5th at p. 627.)  Finally, at disposition and in anticipation the court might terminate jurisdiction, counsel for mother requested a minimum of six hours a week of visitation, which the court granted.  Mother made no objections and suggested no modifications to the court's visitation order when discussed in court below.  Having not raised her objections below, mother cannot now complain of them here.  (*In re Christopher B.* (1996) 43 Cal.App.4th 551, 558.)

To be sure, mother persuasively argues it would have been reasonable for the juvenile court to keep the case open, offer services to mother and father, and assess father's home.  Had the court chosen that path, it would not have been an abuse of discretion.  (See *In re Austin P.* (2004) 118 Cal.App.4th 1124.) However, the court had a variety of options from which to choose. We conclude the option it did choose—termination of jurisdiction

with a custody order—also was not an abuse of discretion. On the record before us, the juvenile court's decision neither exceeded the bounds of reason nor was patently absurd. (*In re Stephanie M.*, *supra*, 7 Cal.4th at p. 318–319.) We are not authorized to substitute one reasonable decision for another. (*Ibid.*)

## 2.     Failure to Make Express Findings

Mother also argues the juvenile court erred when it failed to make express findings supporting its decision to terminate jurisdiction under subdivision (b). Counsel for son correctly agrees this was error. The parties disagree, however, whether this error was prejudicial to mother. We conclude it was harmless error and, therefore, not a ground for reversal.

### a.     Applicable Law

Section 361.2, subdivision (c) provides in full, "The court shall make a finding, either in writing or on the record, of the basis for its determination under subdivisions (a) and (b) [of that section]."

"An express finding on a contested issue—or a statement of reasons for a judicial decision—can shape and improve the adjudicatory process through either or both [of] two mechanisms. First, it can directly influence the trial court's *actual reasoning process* by compelling it to consciously consider and resolve specified issues. Second, it can *enhance appellate review* of the trial court's reasoning by making that reasoning explicit and reducing, if not eliminating, the role of inference on appeal. Ordinarily, of course, appellate courts will indulge all reasonable inferences favorable to the judgment. But this familiar doctrine becomes potentially subversive where the Legislature requires the trial court to make an express finding. Such a requirement

may be deprived of all force if appellate courts feel free to infer a supporting finding where the trial court has left the record silent. For that reason the doctrine of implied findings may be given limited scope where an express finding is required." (*In re J.S.* (2011) 196 Cal.App.4th 1069, 1078.)

"The same cannot be said, however, of another familiar barrier to appellate reversal: the rule of harmless error. Before any judgment can be reversed for ordinary error, it must appear that the error complained of 'has resulted in a miscarriage of justice.' (Cal. Const., art. VI, § 13.) Reversal is justified 'only when the court, "after an examination of the entire cause, including the evidence," is of the "opinion" that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.'" (*In re J.S.*, *supra*, 196 Cal.App.4th at p. 1078.)

### b. The error was harmless.

The juvenile court failed to articulate its basis for terminating jurisdiction and issuing its custody order. This was error. (§ 361.2, subd. (c).) Nonetheless and contrary to mother's position, we conclude the court's error was not prejudicial and not a ground for reversal.

As we discussed above, the juvenile court's decision to terminate jurisdiction under subdivision (b) was reasonable and appropriate. Based on the record before us, we see no reason why the court would have come to a different decision had it complied with the statutory requirement to express the basis for its decision. Immediately before terminating jurisdiction and issuing the custody order, the juvenile court heard argument on why it should or should not terminate jurisdiction. The court was persuaded son was safe with father and its jurisdiction was no

22

longer necessary. Although, as mother mentions, the juvenile court began the adjudication and disposition hearing by noting it was "leaning towards" addressing jurisdiction and delaying disposition so father could move to Alaska with son, this was simply the court's inclination before hearing from counsel. The court then heard, for example, that the Department already had authorized father to move to Alaska with son and no one opposed placement with father. As is apparent, after hearing argument from all counsel, the court changed its mind, which of course it is permitted to do. (*In re J.S.*, *supra*, 196 Cal.App.4th at p. 1081.) Additionally, at the close of that hearing, the court made comments indicating it understood what it was doing and would not have come to a different decision had it made express findings. Specifically, the court briefly mentioned an earlier case in which the Court of Appeal reversed the juvenile court's order placing a child with an out-of-state parent. The juvenile court distinguished the instant case, noting mother and father both can seek modifications of the custody order because it will be filed in family court and given a "family law number."

We decipher no reasonable probability that, had the juvenile court made express findings as it was required to do, the court would have reached a different conclusion more favorable to mother.

23

## DISPOSITION

The juvenile court's June 29, 2023 orders are affirmed.

NOT TO BE PUBLISHED.


                                                    LUI, P. J.

We concur:



ASHMANN-GERST, J.



HOFFSTADT, J.